E. A. PULLIAM, PLAINTIFF IN ERROR, v. STATE OF NEBRASKA, DEFENDANT IN ERROR.

94 N. W. 2d 51

Filed January 16, 1959. No. 34427.

*Chester N. Sutton,* for plaintiff in error.

*Clarence S. Beck,* Attorney General, and *Richard H. Williams,* for defendant in error.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

An information filed by the State in the district court for Washington County charged defendant, E. A. Pulliam, in four separate counts with the crime of selling mortgaged personal property, and in four other separate counts charged defendant with the crime of removing mortgaged personal property out of and away from Washington County.

Defendant pleaded not guilty to each separate count, and upon trial to a jury defendant's motion for directed verdict made at conclusion of the State's evidence was overruled. Thereafter, upon submission of the issues to a jury, it rendered separate verdicts finding defendant guilty as to counts I, II, III, and IV, but not guilty as to counts V, VI, VII, and VIII. Subsequently, defendant's motion for new trial was overruled. Thereafter, judgment was rendered against defendant, and he was sentenced separately upon the first four counts, but said sentences were ordered to be served concurrently.

Thereupon defendant prosecuted error to this court and assigned in his brief: (1) That there were errors of law occurring at the trial and duly excepted to by defendant; (2) that there was an abuse of discretion by the trial court which prevented defendant from having a fair and impartial trial; (3) that the verdict was not sustained by sufficient evidence; and (4) that the trial court erred in giving instruction No. 29 in connection with the statement that defendant contends he received oral permission from the bank to make each sale. We sustain the last assignment.

Section 69-109, R. R. S. 1943, makes it a crime to sell, transfer, or dispose of mortgaged personal property or any part thereof without consent of the owner or holder of the debt secured by said mortgage, and prescribes a penalty for violation. As said in State v. Butcher, 104 Neb. 380, 177 N. W. 184: "The statute in question contains all the elements of the crime for which it is sought to provide punishment. The offense is purely statutory. The criminal act charged is made to consist in doing the things which the statute inhibits and makes their commission a crime. Hence, the law does not provide for criminal intent as being an essentially concomitant ingredient of the crime." The opinion also held that: "* * * The law was enacted to prevent the fraudulent transfer of mortgaged chattel property."

On the other hand, section 69-110, R. R. S. 1943, makes it a crime to remove, permit, or cause to be removed any mortgaged personal property or any part thereof out of the county within which such property was situated at the time such mortgage was given thereon, with intent to deprive the owner of said mortgage of his security, and prescribes a penalty for violation. As held in Wilson v. State, 43 Neb. 745, 62 N. W. 209: "Under the statute, the gist of the offense for which punishment is therein prescribed is the fraudulent removal of mortgaged personal property out of the county with the intent to deprive the owner of the mortgage of his security. The mortgagor who fraudulently removes from the county any portion of the mortgaged chattels, during the existence of the lien or title created by the mortgage, is equally amenable to the provisions of the law as the mortgagor who so removes the entire property mortgaged." Thus criminal intent is an essential concomitant ingredient or element of such crime.

The information here involved alleged in substance that on or about September 13, 1955, in Washington County, Nebraska, defendant did then and there in due form of law mortgage to North Side Bank, hereinafter called the bank, the following: 354 head of Yorkshire hogs, further separately listed as gilts, shoats, boars, sows, and pigs, described by weight or age and numbers of each; 45 head of Black Angus cattle, further separately listed as bulls, cows, heifers, and calves, described by weight or age and numbers of each; and 133 head of Shorthorn cattle, further separately listed as bulls, cows, steers, and calves, described by weight and numbers of each.

Count I appropriately charged in substance that on or about October 7, 1955, during existence of the lien of said mortgage, defendant unlawfully, fraudulently, and feloniously sold 67 white pigs described in said mortgage as Yorkshires to one Marvin Knickman, doing business as Knickman Livestock Sales Company, without first pro-

curing consent of the bank, owner and holder of the debt secured by said mortgage.

Count II likewise charged in substance that on or about October 4, 1955, during existence of the lien of said mortgage, defendant unlawfully, fraudulently, and feloniously sold four hogs, five yearling calves, and one calf, described in said mortgage, to Omaha Livestock Commission Company, without first procuring consent of the bank, owner and holder of the debt secured by said mortgage.

Count III then appropriately charged that on or about October 7, 1955, during existence of the lien of said mortgage, defendant unlawfully, wrongfully, knowingly, and feloniously removed part of said mortgaged property, to wit, 67 white pigs, out of and away from Washington County, where they had been mortgaged and kept, and that defendant did so with intent to deprive the bank of its security and defraud it thereby.

Count IV likewise charged in substance that on or about October 4, 1955, during existence of the lien of said mortgage, defendant unlawfully, wrongfully, knowingly, and feloniously removed part of said mortgaged property, to wit, four hogs, five yearling calves, and one calf, out of and away from Washington County, where they had been mortgaged and kept, and that defendant did so with intent to deprive the bank of its security and defraud it thereby.

Since defendant was acquitted as to counts V, VI, VII, and VIII, it would serve no useful purpose to review them here.

Under assignments of error numbered herein for convenience as No. 1 and No. 2, defendant argued that the trial court committed prejudicial error in the admission over objection of certain evidence appearing in various places throughout the voluminous record, upon the theory that it erroneously allowed defendant's character to be an issue. To search out and recite such evidence here would serve no useful purpose.

In that respect, as recently as Wieck v. Blessin, 165 Neb. 282, 85 N. W. 2d 628, which presented a comparable situation, we reaffirmed that: "The function of assignments of error is that they set out the issues presented on appeal. They serve to advise the appellee of the questions submitted for determination in order that the appellee may know what contentions must be met. They also advise this court of the issues which are submitted for decision.

"In order that assignments of error as to the admission or rejection of evidence may be considered, the holdings of this court require that appropriate reference be made to the specific evidence against which objection is urged."

In that opinion, after citing other authorities from this jurisdiction, we quoted with approval from Minick v. Huff, 41 Neb. 516, 59 N. W. 795, wherein this court held: "It is no part of the duty of this court to search a record for the purpose of ascertaining if there is error in it. On the other hand, every reasonable presumption will be indulged in favor of the correctness of the judgment of a district court, and any ruling of that court, alleged to be erroneous, must be specifically pointed out to be reviewed here."

Viewed in such light, we do not properly have before us for determination the question of admissibility of evidence about which defendant complains, some of which was admitted without objection or adduced by defendant himself, and only part of which was generalized in defendant's argument without any appropriate reference whatever being made in defendant's assignments of error to the specific evidence against which objection is urged. It is sufficient to say that the admission of such evidence was not a plain error unassigned, which would require reversal. In that connection, the general rule is that: "Where guilt of a defendant depends upon the intent, purpose, or design with which the act was done, or upon guilty knowledge thereof, collateral facts in

which he bore a part occurring before and leading up to the transaction complained of may be examined for the purpose of establishing such guilty intent, design, purpose, or knowledge, even though such facts show the commission of another crime." Yost v. State, 149 Neb. 584, 31 N. W. 2d 538.

We turn then to defendant's assignment that the verdict was not sustained by sufficient evidence. In that connection, as recently as Birdsley v. State, 161 Neb. 581, 74 N. W. 2d 377, this court reaffirmed that: "In criminal cases, it is not the province of the court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence. Those matters are for the jury.

"This court, in a criminal action, will not interfere with a verdict of guilty, based upon conflicting evidence, unless it is so lacking in probative force that we can say, as a matter of law, that it is insufficient to support a finding of guilt beyond a reasonable doubt.

"The credibility of witnesses and the weight of their testimony are for the jury to determine in a criminal case, and the conclusion of the jury should not be disturbed unless it is clearly wrong."

Viewed in that light, the record as summarized reveals the following pertinent evidence: On February 21, 1955, a chattel mortgage was duly executed in Washington County by defendant to the bank. That mortgage covered 187 head of cattle further separately listed as purebred Shorthorn cows, heifers, bulls, and calves, described by weight or age and numbers of each, and as purebred Angus cows, bulls, and a calf, described by age and numbers of each. Such mortgage also described: "1 Shorthorn bull, 4 years old. Deceased—insured for $8,500, known as C. B. Gold Max IV." In that connection, it was later discovered by the bank and admitted by defendant that such bull was not deceased, and was not insured for $8,500 as represented by defendant. As a matter of fact, on November 16, 1955, such bull was

admittedly alive and was located by the bank's officers at a place away from Aksarben Acres, the farm operated by defendant in Washington County. Later said bull was sold by the bank and the proceeds therefrom were applied on defendant's indebtedness to the bank.

The mortgage, on February 21, 1955, also covered 537 purebred Yorkshire hogs, further separately listed as boars, sows, gilts, and pigs, described by age and weight or numbers of each, together with other described and enumerated personal property and "All farm machinery and equipment and other chattels deliniated (delineated) in chattel mortgage dated November 1, 1954 and all natural increase of said live stock, * * * wheresoever located or found." Defendant also represented in said mortgage that "The above described live stock are owned by him free and clear of all liens and encumbrances, and are or will be on his premises above described home located 3 Mi. East & 3 Mi. North of Bennington in Section 19, Township 17, Range 12 in Washington County, Nebraska. 20 Acres on West Maple Street, ½ Miles North of Elkhorn, Douglas County, Nebraska." Such mortgage was given to secure payment of one promissory note for $33,500 given by defendant to the bank on February 21, 1955, which note matured in one week, on February 28, 1955. When that mortgage was executed, no inspection or count was made of the livestock and chattels covered by the mortgage, but defendant represented that it then covered all of the livestock owned by him on his place, and such mortgage was duly filed in both Washington and Douglas counties on February 22 and February 23, 1955. Five notations appear on the face of the mortgage indicating that at various times between February 21, 1955, and September 28, 1955, certain livestock covered by the mortgage, but not here involved, was sold, with the proceeds applied by the bank on previous notes given to it by defendant.

Also, in that connection, on September 13, 1955, de-

fendant duly executed the chattel mortgage heretofore mentioned in Washington County to the bank and same was duly filed in Washington County on September 14, 1955. That mortgage covered the hogs, pigs, cattle, and calves heretofore described, and was given to further secure four outstanding promissory notes given to the bank by defendant, to wit: "One for $2,170.00 Dollars, * * * dated August 23, 1955 due October 15, 1955 One for $9,576.90 Dollars, * * * dated August 30, 1955 due October 22, 1955 One for $23,900.00 Dollars, * * * dated November 1, 1954 due six months after date One for $33,500.00 Dollars, * * * dated February 21, 1955 due February 28, 1955 * * *" making a total of $69,146.90. Such mortgage was also in like form with that executed February 21, 1955, except it read: "This mortgage is taken as additional security and is not intended to release or discharge any existing rights, mortgages or liens." Defendant also represented that: "The above described live stock are owned by him free and clear of all liens and encumbrances, and are or will be on his premises above described. —— home located 3 Miles East & 3 Miles North of Bennington in Section 19, Township 17, Range 12 in Washington County, Nebraska." Four notations appear on the face of the mortgage, indicating that at various times between September 13, 1955, and October 11, 1955, certain livestock, not directly involved here, was sold or condemned by the government, with the proceeds applied by the bank upon defendant's indebtedness to the bank.

The information concerning the livestock thus mortgaged on September 13, 1955, was taken from an inspection and exact count thereof by defendant, and the bank's officers on September 1, 1955. Such animals were personally pointed out by defendant at his farm home known as Aksarben Acres, and at another location nearby in Washington County, where defendant represented that he owned all the animals. In other words, the bank at all times had a chattel mortgage on all livestock owned

by defendant. However, from time to time during October 1955, defendant was given permission from the bank to butcher some 83 hogs not directly involved to supply a sausage business operated by defendant, and the proceeds therefrom received by the bank were applied upon defendant's indebtedness to the bank.

Also, on September 6, 1955, a sworn financial statement was given by defendant to the bank. Such statement enumerated and placed a value on the 178 cattle and calves, and the 354 hogs and pigs described and included in the September 13, 1955, mortgage, together with defendant's farm home, other assets, and other chattels, some of which were included in the February 21, 1955, mortgage. Admittedly, one such other asset was falsely represented as "Due from Ins Co on Bull $8500," when in fact, as heretofore mentioned, such bull was still alive and nothing was due from any insurance company. Such statement also recited defendant's liabilities and falsely represented that as of September 1, 1955, he had a net worth of $28,360.

Defendant's wife, who was a cosigner of the notes given the bank, also gave a sworn financial statement on September 4, 1955. Therein she represented that she owned current cash and assets of $8,300, and described real estate worth $70,000, making a net worth of $78,300. However, one such item of real estate was "Acres 160 Legal Description (show county and state) Mills Co Ia Title in Ruth Pulliam Value $32000 Liens None." However, it was later discovered that she in fact never had owned any such land, and without such asset the livestock security was insufficient.

In the situation aforesaid, the bank's board of directors had a meeting on November 10, 1955, and decided to call defendant's loan and foreclose. Thereafter, on November 11, 1955, the bank's lawyers went to the bank to work out ways and means of handling the situation. While they were doing so, defendant came into the bank and was told about the bank's decision, where-

upon defendant reluctantly consented to voluntary foreclosure rather than formal action. That afternoon the president of the bank and one of its lawyers went out to defendant's farm where they saw numerous hogs in the lots and some cattle around the barn. In defendant's presence they ordered two trucks from a transportation company to come to defendant's farm, where they loaded 139 Yorkshire hogs, covered by the mortgage, and sent them to a livestock commission company in Fremont, where later defendant personally helped with the sale of the animals. They also talked with defendant on November 11, 1955, about sale of the rest of the hogs and cattle, and from defendant's home they then ordered seven more trucks to come the next day, November 12, 1955, and haul the rest of the livestock away.

However, about 6:30 a. m., November 12, 1955, defendant called the bank president by telephone, saying: "You needn't come out * * * All the cattle and hogs are gone." Thereupon the president of the bank and one of its lawyers went out to defendant's farm. There defendant said: "All the cattle are gone," but there were about 20 head in a pen near the barn. When asked, "Where did the cattle go?" Defendant said "They went to Western, Nebraska." When asked "Where?" Defendant replied, "I won't tell you * * * You will get your money when they are sold." When asked, "Who took them out?" Defendant said "The trucker." When asked "From where?" Defendant said "The trucker from Pender, Nebraska." When asked "Where did he take them?" Defendant refused to tell. Later that day, however, the president of the bank and its lawyer saw several cattle at another location on defendant's farm, which created a suspicion, so they drove over where the 45 Black Angus cattle were counted on September 1, 1955, and included in the mortgage on September 13, 1955, when defendant represented that they belonged to him. Such cattle were still there, but it was later discovered that none of them at any time ever belonged

to defendant as represented and mortgaged by him.

Early Monday morning, November 14, 1955, the president of the bank and one of its lawyers went out to defendant's farm. Defendant was not there at that time, but they waited for his return. He shortly returned and said that he had been to see the county attorney and sheriff at Blair and had made a clean breast of everything. They then went into defendant's house where he admitted that he had sold the mortgaged cattle and appropriated the proceeds to his own use. When asked where he had sold the other mortgaged livestock, defendant handed the bank's president and lawyer exhibit No. 5, an account of sales for Aksarben Acres through the Knickman Livestock Sales Co. of Council Bluffs on October 7, 1955, of 67 white pigs, for a net of $670, which defendant had appropriated to his own use. Defendant then also handed them exhibit No. 6, an account of sale showing a sale by defendant through the Omaha Live Stock Commission Co. on October 24, 1955, but designated as "Ship 10/4/55" of one calf for which defendant was allowed $20.55, and he appropriated that amount to his own use. The bank's lawyer then remarked that such two accounts of sale did not cover many of the missing animals, and asked defendant where the rest of the accounts of sale were, whereupon defendant replied that they were in a pile on his desk, and he could not then give the names, but he did give the names of some places where other mortgaged animals had been sold. Also, on November 14, 1955, another 14 head of hogs and 22 head of cattle were found on defendant's farm and hauled into a livestock commission company for benefit of the bank.

Exhibits Nos. 7, 8, and 9 are two accounts of sale and one delivery receipt representing the livestock hauled from defendant's farm by the bank, covering all the mortgaged animals the bank's officers could find. On November 14, 1955, defendant also revealed that he had sold 39 head of cattle to one Zimmerman for $3,125,

but the bank later received those funds. Thus, from the total number of cattle and calves covered by the September 13, 1955, mortgage, 82 head were not accounted for by defendant, and from the total number of hogs and pigs covered by said mortgage, 104 were not accounted for by defendant. In that connection, on November 17, 1955, defendant gave the bank's lawyer exhibit No. 28, a list of 10 various named livestock firms where he had sold mortgaged livestock which had not been accounted for. Such list included "Marvin Knickman Sales Co. C/B" where the October 7, 1955, sale and removal had been made by defendant, and the "Om Livestock Com Oma" where the October 4, 1955, sale and removal had been made by defendant.

In that connection, the president of the Omaha Livestock Commission Company of Omaha testified that exhibit No. 22 was an account of sale for defendant through said company of four hogs, three heifers, two yearlings, and one calf, on October 4, 1955, for $480.54 net. Exhibit No. 19 is a cancelled check issued October 4, 1955, by said company for that amount, payable to defendant, who endorsed said check and appropriated the amount to his own use.

Also, Marvin Knickman, operator of Knickman Livestock Sales Company in Council Bluffs, but designated by defendant in exhibit No. 28 as "Marvin Knickman Sales Co. C/B," identified exhibit No. 10 as an account of sale by his company for defendant of 67 white pigs on October 7, 1955, for $670. Exhibit No. 11 is a cancelled check issued by said company, which check was endorsed "Aksarben Acres by E. A. Pulliam" and the amount thereof was appropriated by defendant to his own use. Exhibit No. 5, which had been handed by defendant to the bank's officers on November 14, 1955, with the admission that he had on October 7, 1955, sold the mortgaged 67 white pigs described thereon and appropriated the money to his own use, was a carbon copy of the aforesaid exhibit No. 10.

Further, exhibit No. 25 is a copy of a ledger sheet taken from the records of trucker Dan Greeno, showing, together with evidence of the trucker's wife, that on October 7, 1955, the trucker hauled "67 stock to Co Bluffs" for defendant to the Knickman Livestock Sales Company. The trucker's wife, who kept his records, was asked on cross-examination: "I want to know if you knew what place Mr. Greeno went to get those 67 pigs?" Thereto she replied, referring to defendant, "To my knowledge it was his home place." In that connection also, the trucker testified that at defendant's direction such animals were picked up at Aksarben Acres, defendant's farm, and hauled to the Knickman Livestock Sales Company at Council Bluffs.

The president of the bank testified that only he and another named officer of the bank had any authority to give defendant consent to sell, transfer, or dispose of or remove any of the mortgaged property. In that respect, no consent was ever so given for the sale by defendant of the mortgaged property aforesaid, either on October 4, 1955, or on October 7, 1955, or for the removal thereof by defendant from Washington County on either of said dates, and the bank never received the proceeds from any such sales on either of said dates. In that connection, defendant admitted that he made such sales and removals and did not turn over to the bank any proceeds from either sale of the four hogs, three heifers, two yearlings, and one calf, on October 4, 1955, or from the sale of the 67 white pigs on October 7, 1955. His explanation of the reason therefor will be later discussed.

After application of the net proceeds of all sales made by the bank in calling defendant's loan, and after giving him all credits due on all accounts paid over by defendant, he still remained indebted to the bank for $54,553, and defendant had no other available assets with which to liquidate any part of it. That account included a note for $33,500 given the bank to cover an

overdraft in defendant's checking account of $30,405, which resulted from a manipulation of insufficient fund checks between a bank account at Bennington and his bank account at the North Side Bank. However, defendant was found not guilty in a federal criminal prosecution involving those transactions. In that connection, defendant was asked on cross-examination if he had ever been convicted of a felony, whereupon he replied, without objection, that he had been prosecuted for several felonies but he could not remember whether he had ever been convicted.

For his defense, defendant produced several witnesses who testified to various sales of hogs to defendant as a livestock buyer during 1955. One witness testified by deposition that he shipped some of his Shorthorn cattle to defendant during June and October 1955, with authority of defendant to sell them. Defendant testified that the six head of cattle and four hogs he was charged with selling and removing on October 4, 1955, were partly animals that he had bought and partly animals sent him for the purpose of sale by the owner, and that none of such animals were covered by the September 13, 1955, mortgage.

He also testified that the 67 white pigs he was charged with selling and removing on October 7, 1955, came from sows purchased by him over in Iowa in July 1955, and left there during weaning, but later removed to his farm. He also testified that they were not covered by the September 13, 1955, mortgage. He further testified that when the individual count of the livestock on his farm was made by him and the bank's officers in September 1955, he had other animals on other lands which he did not show the officers. Defendant denied that he had ever told the bank's officers that he had sold animals that were mortgaged. He admitted that he had talked with the county attorney and sheriff at Blair on November 14, 1955, but denied that he had confessed anything to them. Defendant admitted that on

November 12, 1955, he called the president of the bank and told him that he did not need to come out because the livestock was gone, and defendant admitted that on November 14, 1955, at his home the bank's officers wanted to know what had happened to the missing livestock, and he told them that he had sold a lot of it. Defendant testified that he had sent the cattle to one Zimmerman in Iowa where they were sold with the bank's officers present, and that he did not need consent to sell such cattle because after he had gone to the bank on November 11, 1955, its officers told him to sell them and they had gone with him to collect the money.

Defendant testified that the shortage of mortgaged hogs was accounted for because some were put in sausage and some were sold, with all proceeds therefrom paid to the bank. He also testified that the shortage of cattle was accounted for by sales, with the proceeds therefrom paid to the bank to reduce admitted overdrafts.

In the light of the aforesaid evidence, we conclude that the verdict and judgment were amply supported by competent evidence.

We turn then to the assignment and argument that instruction No. 29, given by the trial court, was prejudicially erroneous. We conclude that it was. Instruction No. 29 told the jury: "The State of Nebraska has charged the defendant with making four sales of certain items of livestock which were covered by the mortgages given to the North Side Bank by the defendant, and in each instance the State alleges in the various Counts relating to these sales that the defendant did not receive written permission of the bank before making such sale or sales. The defendant contends that he received oral permission from the bank to make each sale, and you are instructed that such oral permission, if given as contended by the defendant, was sufficient authorization for him to make such sales, and you should acquit him on any Count charging him with the crime

of selling mortgaged property if you find that oral consent was given for such sale or sales."

In that connection, defendant did not testify in any respect that he had permission to sell or remove the three heifers, two yearlings, one calf, and four hogs on October 4, 1955, and the 67 white pigs on October 7, 1955. Defendant's theory of defense at all times was that such livestock was not covered by the mortgage of September 13, 1955, and that he did not have and was not required in any manner to have the bank's consent to such sales or removals. The only testimony of defendant with regard to consent was given with regard to the cattle sold on November 14, 1955, after the bank had called defendant's loan, and the information contained no charge relating to sale or removal on that date.

Viewed in such light, the instruction erroneously submitted the existence of material facts with relation to defendant's theory of defense which were not supported by any competent evidence, and in effect erroneously assumed that defendant had sold the mortgaged property as charged but did so with the bank's consent, which was a controverted material fact upon which there was a conflict of testimony.

In that connection, it has long been a rule in this state that: "The giving of an instruction which submits to the jury the existence or non-existence of a fact material to the issues in the case on trial, when no evidence has been introduced which would support a finding of its existence, is error for which the judgment may be reversed." Morearty v. State, 46 Neb. 652, 65 N. W. 784.

It is also the rule that: "It is error to give an instruction which assumes a controverted material fact upon which there is a conflict of testimony." Metz v. State, 46 Neb. 547, 65 N. W. 190. See, also, Fullerton v. State, 148 Neb. 811, 29 N. W. 2d 618.

In respect to defendant's contention that instruction No. 29 was prejudicially erroneous, we have considered all of the instructions and conclude that in such respect

it did not fully, fairly, and correctly state the law. The conclusion is inevitable that instruction No. 29 was prejudicially erroneous, and deprived defendant of a fair and impartial trial.

For reasons heretofore stated, the judgment of the trial court should be and hereby is reversed and the cause is remanded for new trial on counts I, II, III, and IV of the information.

REVERSED AND REMANDED.