JERRY ERVING, PLAINTIFF IN ERROR, V. STATE OF NEBRASKA, DEFENDANT IN ERROR.

MILTON HOWARD, PLAINTIFF IN ERROR, V. STATE OF NEBRASKA, DEFENDANT IN ERROR.

116 N. W. 2d 7

Filed June 29, 1962. Nos. 34911, 34912.

Schrempp & Lathrop and O'Sullivan & O'Sullivan, for plaintiffs in error.

Clarence A. H. Meyer, Attorney General, and Cecil S. Brubaker, for defendant in error.

Heard before SIMMONS, C. J., CARTER, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ., and CHADDERDON, District Judge.

SPENCER, J.

These are two criminal actions instituted in the district court for Douglas county by separate informations charging Jerry Erving and Milton Howard with murder in the first degree. The cases were consolidated for trial. The jury found the defendants guilty and fixed their punishment at life imprisonment. Both defendants appeal.

The record is voluminous and it will serve no useful purpose to attempt to summarize all the evidence. The defendants do not question its sufficiency to sustain the convictions. Suffice it to say that it was more than ample if believed by the jury to sustain a conviction.

We therefore will attempt only the briefest outline.

On December 27, 1959, Edward Ellis and Dorothy Elliott were found dead in an upstairs apartment they shared. Each had been shot twice in the head, once with a 38-caliber bullet and once with a 22-caliber bullet. Each had died of the gunshot wounds.

Edward Ellis, hereinafter referred to as Ellis, was to have been a witness against the defendant Milton Howard, hereinafter referred to as Howard, on a federal complaint which charged Howard with selling narcotics to Ellis. Preliminary hearing on that complaint was set for December 28, 1959.

Donald Williams, who confessed to being an accomplice in the killing, testified for the State that Howard told him on December 24, 1959, that it was worth $1,000 for Edward Ellis not to testify. Another witness, Rudolph Williams, testified he had been at the home of the defendant, Howard, on December 24, 1959, and while there heard Howard tell the defendant, Jerry Erving, hereinafter referred to as Erving, that Ellis had to go and it was worth $1,000.

Donald Williams testified he saw Erving's car at the Howard home on Christmas Day, and a little later Erving came to him and asked where Ellis lived and if he could arrange to get Ellis to come out or if not if he could get Erving up inside the house. Donald Williams said he might the next day. Later that day, Howard came over to Donald Williams' home and indicated his knowledge of Erving's conversation with Williams.

Donald Williams further testified that he called Erving the next evening, December 26, 1959, sometime after 11 o'clock, and the two of them went to the Elliott-Ellis apartment. Donald Williams took along a 38-caliber revolver he had earlier acquired from Howard. During the ride over, Erving gave Donald Williams one of his brown gloves to wear. Donald Williams was admitted to the house by Dorothy Elliott but he could not persuade Ellis to leave the house so he left, but as he did

so he fixed the lock on the front door so that it would not lock. Then he and Erving went back up the stairs to the Elliott-Ellis apartment, he picked a quarrel with Ellis, and pulled out his gun. Dorothy Elliott, who was sitting on the couch, grabbed his arm. The gun went off, and she slumped back on the couch. Donald Williams said he then ran out of the house but heard other shots behind him. He wasn't sure whether or not he shot Ellis.

Erving later picked Donald Williams up in his car and they drove to Carter Lake, about a mile away, where Donald Williams, at Erving's direction, threw both guns, his 38-caliber and a small caliber revolver given to him by Erving, into the lake. Williams also threw his brown glove out of the car window at Erving's direction.

When Erving left Donald Williams that night he told Williams he would be by the next day with some money for him. The next day Erving stopped at Donald Williams' home and gave him $150. Later that day Howard came to the Donald Williams' home with Rudolph Williams. Howard told Donald Williams he had paid Erving and gave him $250, saying that would make a total of $500, less the $100 Erving said that Williams owed to him.

After his arrest, Donald Williams took the police to Carter Lake where they found two brown gloves and where they later recovered a 38-caliber revolver and a 22-caliber revolver from the water at the spot where Donald Williams said he had thrown them. The guns were rusted and corroded, and both of them had spent shells in their chambers. The slugs found in the heads of the victims and in the sofa on which they were found were examined by experts. They appeared to have the same characteristics as the live bullets remaining in the guns; could have come from the spent shells in the guns; and could have been fired from guns having the same rifling characteristics as the guns found in the lake. The shells in the 22-caliber gun were of the same type as

some 22-caliber shells found in the glove compartment of the Erving car.

Howard's defense was a complete denial of implication in the shooting and an alibi. He denied ever mentioning it was worth $1,000 to get rid of Ellis. He did admit to giving Williams $250, but claimed it was for an unmounted diamond Williams sold to him on Christmas Eve. A court reporter testified on rebuttal that on an earlier occasion Howard had said he gave Williams the $250 for the purpose of enabling Williams and Ellis to leave town and to hide out in Chicago.

Erving's defense was also a denial and an alibi. He claimed he and Howard were in Council Bluffs at the time Donald Williams claimed the killing took place. There was no question the defendants had been in Council Bluffs earlier that evening. There was, however, some inconsistency in the time involved, which, if believed by the jury, was consistent with Donald Williams' testimony.

While the defendants do not question the sufficiency of the evidence, they do seriously urge nine separate assignments of error involving trial procedures and the admission of evidence. These will be considered in the order of assignment.

Defendants first contend that the court erred in permitting a witness for the State to testify that he had purchased narcotics from the defendants. This refers to the testimony by State's witness, Donald Williams, who had confessed to complicity in the murders and had implicated the two defendants. On direct examination, he had testified to his use of narcotics. On cross-examination he was questioned at considerable length about the use of narcotics as well as about his knowledge that the two murder victims were addicts. He was specifically asked on cross-examination if he had ever used narcotics with Edward Ellis, one of the victims. On redirect examination he was asked: "Q- Just explain where you would get these narcotics that you used

with Edward Ellis? * * * MR. O'SULLIVAN: (continuing:) Object to that as incompetent, irrelevant, immaterial, and not tending to prove or disprove any issue in the case; nothing in the direct examination to show whatever drugs he used. THE COURT: You may answer. A- We were supplied by either of the two defendants; they usually supplied any quantity."

As a general rule, evidence of other crimes than that with which the accused is charged is not admissible in a criminal prosecution. Fricke v. State, 112 Neb. 767, 201 N. W. 667. However, in crimes involving motive, criminal intent, or guilty knowledge, evidence of independent crimes wholly disconnected with the one charged may be received. Swogger v. State, 116 Neb. 563, 218 N. W. 416. See, also, Grandsinger v. State, 161 Neb. 419, 73 N. W. 2d 632. Motive was an important element of proof. It involves an exception to the rule contended for by the defendants. Exhibit No. 18, about which the witness had been questioned, was a complaint charging defendant Howard with a narcotics violation in which Ellis appeared to be an informer. Further, in the light of the extensive cross-examination of the witness as to his involvement with narcotics and his knowledge from personal observation of the addiction of the murder victims, it was not error to show the involvement of the defendant Howard in the sale of narcotics to the murder victim who was to be a witness against him on a charge of such sale. The evidence elicited as to the source of supply of narcotics involved both of the defendants and served to strengthen the showing of motive with respect to Howard.

Defendants' second assignment of error is that the court should have sustained a motion for mistrial occasioned by the State asking the defendant Howard if he sold narcotics to one of the State's witnesses. Objection was made to the question and the objection was sustained. Request was then made of the court to admonish counsel and also that the court instruct the jury

to disregard the statement of the prosecutor. The court then asked the reporter to read back the question and again sustained the objection to the question. Counsel for defendants then moved for a mistrial, which motion was overruled. While the defendant Howard might not be required to answer the question because it might incriminate him, the question itself was not prejudicially erroneous. The court did sustain the objection. As set out above, the showing of motive is an exception to the rule contended for by the defendants. The question did not inject any new crime or element into the case.

The third assignment of error contends that the court erred in permitting the deputy county attorney to cross-examine the defendant Howard concerning his alleged source of supply of narcotics. Howard, in his direct examination, testified that Cox, a federal narcotics agent, in an interview at the Douglas county jail, had suggested the story he should tell about his connection with the murder. He testified that he refused to do so, contending he had no connection with the murder. Howard also testified on direct examination that Cox wanted him to gather information on dope activity. The questions asked on cross-examination concerned his conversation with Cox, which subject was opened up by the direct examination.

In Grandsinger v. State, 161 Neb. 419, 73 N. W. 2d 632, we said: "When a defendant in a criminal case testifies in his own behalf he is subject to the same rules of cross-examination as any other witness and may be required to testify on his cross-examination as to any matter brought out or suggested by him on his direct examination, and ordinarily he cannot avail himself of the objection that the evidence may incriminate him." In the same case we also said: "The cross-examination of a witness which relates to the issues and facts pertinent thereto may be pursued by counsel as a matter of right, but when the object of the cross-examination is to collaterally ascertain the accuracy or credibility of

a witness, some latitude should be permitted. The scope of such latitude is ordinarily subject to the discretion of the trial judge and, unless abused, its exercise is not reversible error." There was no abuse of discretion in this instance. Actually, the record indicates that the trial judge could have been more lenient than he was and still have been within the rule.

In connection with these assignments of error, the court, by instruction No. 16, about which defendants make no complaint, restricted the evidence complained of to the proof of motive. The instruction given is as follows: "You are instructed that evidence adduced that the defendant Milton Howard committed another crime, or crimes, for which he had not been apprehended or tried, was admitted for the sole and only purpose of tending to prove that the defendant Howard had a motive and the intent to commit the alleged crime for which he is here tried, and such evidence shall be considered by the jury for that purpose only."

Assignments of error Nos. 4, 5, and 6 relate to the question as to whether desertion from the army is a felony under Nebraska law for the purpose of impeachment under section 25-1214, R. R. S. 1943. Defendant Erving was asked on cross-examination if he had ever been convicted of a felony. He replied, "Once." The State then introduced exhibits Nos. 82 and 83. Exhibit No. 82 is a certified copy of a court-martial record showing the conviction of Erving for desertion from the army. Exhibit No. 83 is a certified copy of a conviction of Erving in the United States District Court for the District of Nebraska for violation of the narcotics act, for which sentence was imprisonment for 2 years. It is the defendants' contention that desertion from the army is not a felony for the purpose of impeachment of a witness because it is not punishable under the civil law. They contend that when Erving testified he had been convicted once, he testified truthfully, and the admission of the record of the conviction was prejudicial error. We held in

Vanderpool v. State, 115 Neb. 94, 211 N. W. 605: "Under section 8848, Comp. St. 1922 (now section 25-1214, R. R. S. 1943), providing that a witness may be interrogated as to his previous conviction for a felony, but that no other proof is competent except the record thereof, a defendant in a criminal prosecution becoming a witness in his own behalf may be asked on cross-examination whether he has previously been convicted of a felony, and if he answers in the affirmative further examination along that line should cease. If he answers in the negative, he may be impeached only by the record of his conviction."

The cases cited by the defendants do make the distinction that desertion from the army is not a felony because it is not punishable under the civil law. Historically, by some early English statutes, desertion was made a felony punishable in the civil courts, but those statutes fell into disuse after the Revolution of 1688 when Parliament, by the Mutiny Acts, for the first time authorized mutiny and desertion to be punished by a court-martial in time of peace. In this country, desertion has been made a military offense by the statutes of the United States and, at least since the Declaration of Independence, has been considered exclusively a military crime punishable by court-martial and not by civil tribunals. However, there are cases which hold that conviction by a court-martial of desertion is admissible as affecting the credibility of a witness. See, Jordan v. State, 141 Ark. 504, 217 S. W. 788; Nelson v. State, 35 Ala. App. 179, 44 So. 2d 802.

In Nebraska, the term "felony" is defined by section 29-102, R. R. S. 1943: "The term 'felony' signifies such an offense as may be punished with death or imprisonment in the penitentiary."

Title 10, U. S. C. A., § 885, p. 316, provides in part: "(c) Any person found guilty of desertion or attempt to desert shall be punished, if the offense is committed in time of war, by death or such other punishment as a

court-martial may direct, but if the desertion or attempt to desert occurs at any other time, by such punishment, other than death, as a court-martial may direct."

The defendant Erving was sentenced to confinement in the United States Disciplinary Barracks, Fort Missoula, Montana, for 2 years at hard labor, or elsewhere as the Secretary of War may designate.

Title 18, U. S. C. A., § 1, p. 5, provides in part: "Notwithstanding any Act of Congress to the contrary: (1) Any offense punishable by death or imprisonment for a term exceeding one year is a felony." Title 18, U. S. C. A., § 4083, p. 485, provides in part: "Persons convicted of offenses against the United States or by courts-martial and sentenced to terms of imprisonment of more than one year may be confined in any United States penitentiary."

The purpose of section 25-1214, R. R. S. 1943, is to bring before a jury elements which may serve to test the credibility of a witness. When the defendants testified in their own defense, they thereby assumed the position of ordinary witnesses and were subject to be discredited on cross-examination. The law presumes that the character and reputation of a witness is good and that he will tell the truth when he takes an oath to do so. For this reason, it has always been considered proper in cross-examination to interrogate the witness as to matters which clearly tend to disprove the legal assumption with which he is clothed. Such interrogation is admitted solely to test his credibility and can only be considered by the jury for that purpose.

To protect a witness, we have narrowed the scope of the cross-examination by statute, and if he admits his previous conviction, the examination can go no further. If he has been convicted more than once, that certainly also is pertinent on the question of credibility, and we have so held. Sulley v. State, 119 Neb. 783, 230 N. W. 846.

We concede that there is a division of authority in

other jurisdictions as to whether a military conviction of desertion can be used to impeach a witness. It is a case of first impression in Nebraska. Our statute specifically defines a felony as any offense which may be punishable by imprisonment in the penitentiary. We should test the offense by that definition. Desertion may be so punished. In fact, defendant Erving was sentenced to imprisonment for 2 years at hard labor. It is our conclusion that a conviction by a court-martial is a conviction for a felony within the Nebraska definition if the offense for which the conviction is had may be punished by imprisonment in a penitentiary.

The sixth assignment of error urges that the court erred in admitting the court-martial record without foundation. The bill of exceptions does not indicate that such specific objection was made. Exhibit No. 82 is the certificate of the acting chief of the litigation division of the Judge Advocate General's Department, and it is authenticated with the signature of the Secretary of the Army, by his administrative assistant. There is also attached the seal of the Department of the Army. The exhibit meets the test for the production of documentary evidence.

The seventh assignment of error is that the court erred in allowing the State to show that the defendant refused to answer questions put to him by the county attorney soon after his arrest, and that he wanted to see his attorney. The assignment does not specify to which defendant it refers. We assume the reference is to the interrogation of defendant Erving which is entered in the proposed amendments to the bill of exceptions by proposed amendment No. 7 which was accepted by the court. The testimony includes answers voluntarily given by the defendant to questions asked by the deputy county attorney until the defendant noticed the court reporter, when the following occurred: "Q. 'Anybody else?' A. 'What is he writing there?' (indicating) Q. 'All the questions I ask and all of your answers.' A. 'You

people are trying to mess me up. I haven't got nothing more to say. I want to see a lawyer.' Q. 'Let me take you back yesterday from noon on. Did you work yesterday afternoon?' A. 'I want to see a lawyer.' Q. 'Were you home at five o'clock last night?' MR. O'LEARY: Let the record show he refused to answer the question. Q. 'Were you home at six last night?' A. 'I would like to see a lawyer.' Q. 'Were you home at seven last night?' A. (No answer) Q. 'Can your wife verify you were home from ten last night until 6:30 this morning?' A. 'I still want to see a lawyer.' Q. 'Where were you Christmas Day?' A. (no answer) Q. 'Where were you the day before Christmas?' A. (no answer) MR O'LEARY: Let the record show he refuses to answer any further questions." The questions here asked covered answers which tended to impeach his alibi which he had given voluntarily to the questions asked until he observed the court reporter. While it would have been better practice to have left out this portion of the statement in the trial, we do not believe that its admission under the facts herein was erroneous. In any event, the record does not disclose that any objection was made to the reading of this testimony at the time it was offered. Objection to the admission of evidence cannot be considered by this court for some reason not properly and timely raised at the trial. Fugate v. State, 169 Neb. 420, 99 N. W. 2d 868. When the testimony was included in the bill of exceptions by amendment, if the proposal did not include all of the record, the defendants should have pointed out the omission.

The eighth assignment of error is that the court erred in admitting into evidence articles taken from the home of the defendant without a search warrant. Here again, there is no specification as to the defendant involved nor are the specific articles identified in the assignment. The bill of exceptions herein consists of 13 volumes, and specifications of error should be specific. It is no part of the duty of this court to search a voluminous record

for the purpose of ascertaining if there is error in it. Minick v. Huff, 41 Neb. 516, 59 N. W. 795. The function of an assignment of error is to specifically point out the exact instance of the alleged error.

From the argument, we believe that the defendants are referring to certain 22-caliber bullets found in a drawer in the Erving home. When the police came to the Erving home, Mrs. Erving asked them if they had a search warrant, and she was told that they did not, but she made no objection to their entry or to their search. The manner of the search and the action of the officers, as detailed in Mrs. Erving's testimony, if true, would be such as to offend a sense of justice and could not be condoned. If the evidence obtained resulted in a conviction, and proper objections were made, the conviction would have to be reversed.

Subsequent to the trial of this case, the United States Supreme Court decided Mapp v. Ohio, 367 U. S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, which announced the rule that, as set out in the latter citation: "All evidence obtained by searches and seizures in violation of the Fourth Amendment of the Federal Constitution is, by virtue of the due process clause of the Fourteenth Amendment guaranteeing the right to privacy free from unreasonable state intrusion, inadmissible in a state court." It is this rule that defendants urge upon us. This rule is now the law of the land and overruled those decisions which permitted the use of unconstitutionally-seized evidence in a trial in the state courts. However, to be available, as a footnote in Mapp v. Ohio, *supra*, observes, state procedural requirements governing assertion and pursuance of direct and collateral constitutional challenges to criminal prosecutions must be respected.

In Pulliam v. State, 167 Neb. 614, 94 N. W. 2d 51, we held: "In order that assignments of error as to the admission or rejection of evidence may be considered, the holdings of this court require that appropriate ref-

erence be made to the specific evidence against which objection is urged."

The receipt in evidence of the 22-caliber bullets found at the Erving home was a circumstance which might tend to connect defendant Erving with one of the murder weapons. However, shells of exactly the same type were found in Erving's car, so that he was connected with the shells and the weapon involved without this testimony, which at best could only be cumulative. The questioned evidence appears to be exhibit No. 39, which consisted of shells identified by one of the officers who searched the home as being shells found in a drawer in the Erving bedroom. In answer to a question on his direct examination, the officer said he did not have a search warrant. No objection was made to his testimony. On cross-examination, he was not questioned about his search. Exhibit No. 39 was offered in evidence later during the testimony of another officer who was present when the shells were found. The following is the record of the offer: "MR. DENENBERG: At this time the State offers in evidence, Exhibit No. 39. MR. O'SULLIVAN: Objected to as incompetent, immaterial, irrelevant, no proper or sufficient foundation laid. THE COURT: It will be received."

During the testimony of the same officer, exhibit No. 37, which consisted of four 22-caliber long rifle shells taken from Erving's automobile, was offered in evidence. That offer is as follows: "MR. DENENBERG: I offer in evidence, Exhibit No. 37. MR. O'SULLIVAN: That is objected to as incompetent, immaterial, irrelevant, and no proper or sufficient foundation laid. THE COURT: It will be received."

As suggested, the shells in exhibit No. 37 are exactly the same type of shells as offered in exhibit No. 39. The exhibits were properly identified and foundation-wise were admissible. There can be no question that the objections as made were properly overruled. The objections did not in any manner point up the one now

being urged for the exclusion of exhibit No. 39.

The ninth and final assignment of error is as follows: "The court erred in refusing to permit the defendants to inspect statements given to the police and county attorney by the two principal witnesses for the state." This assignment refers to the motion of defendants to require the county attorney to furnish the counsel for defendants with a copy of all statements taken from the witnesses Donald Williams and Rudolph Williams, either by the county attorney or members of the Omaha police department. The stated purpose of the motion was to procure such statements for purposes of impeachment. Support for the motion was on information and belief that such statements were inconsistent with the testimony of the witnesses as given at the preliminary hearing.

Defendants rely on Jencks v. United States, 353 U. S. 657, 77 S. Ct. 1007, 1 L. Ed. 2d 1103, which opened the files of F.B.I. agents touching events and activities to which they had testified at the trial. Defendants contend under the authority of the Jencks case it was a denial of due process not to sustain their motion for production of the statements. With this we cannot agree. It is not a requirement of due process under the Constitution. Actually, Congress, immediately after the Jencks case, by passage of Public Law 85-269, Eighty-fifth Congress (the Jencks Act, Title 18, U.S.C.A., § 3500), substantially curtailed the right of inspection announced in the Jencks case.

The question here presented is not an open one in this jurisdiction. We have held that in a criminal case the trial court is invested with a broad judicial discretion in allowing or denying an application to require the State to produce written copies of statements and other documentary evidence for the inspection of the defendant's counsel before trial. Error may be predicated only for an abuse of discretion. See, Cramer v. State,

145 Neb. 88, 15 N. W. 2d 323; Linder v. State, 156 Neb. 504, 56 N. W. 2d 734.

Both of the witnesses in question were subjected to extensive cross-examination, and both admitted that they at first denied any knowledge of the murders, but later told their stories. Impeachment by contradictory former statements was therefore accomplished by cross-examination in which the inconsistency was pointed out and admitted. The statements themselves, if any had been transcribed, would be cumulative. There is nothing in the record to indicate that any statements were signed, verified, or read and approved by the witnesses as being a correct record of the statements. In fact, Donald Williams specifically negatives any signing or approval of any statement. At best, any statements in the prosecutor's file were nothing more than memoranda or the work product of the county attorney's office.

In Dinsmore v. State, 61 Neb. 418, 85 N. W. 445, the opinion indicates that after making a confession, a witness was examined, but not under oath, by the county attorney, and that the examination was taken down in shorthand by another person. The statement, if transcribed, was never seen or read to the witness or signed by her. Counsel for the defendant at the trial demanded the production of the statement, which demand was refused. We said, at page 436: "This refusal it is urged is a denial of the right of defendant to a full and fair opportunity to cross-examine the witness concerning the facts in the case. We can not see that it was. If the statement was ever transcribed, a fact not positively sworn to by any one, it was the property of the county attorney. It was nothing more than a brief of the evidence prepared by the county attorney for his own convenience in trying the case, or preparing it for trial. We can not imagine any reason for compelling the county attorney to turn over to counsel for defendant his private memoranda. The defendant had no right

to it, and the court was right in refusing to compel a surrender of it." The trial court did not abuse its discretion in denying the motion of the defendants.

For the reasons given above, the assignments of error are without merit. There being no prejudicial error in the record, the judgment of the district court is affirmed.

AFFIRMED.