GILLETTE DAIRY, INC., A NEBRASKA CORPORATION, APPEL-
LANT, v. THE NEBRASKA DAIRY PRODUCTS BOARD ET AL.,
APPELLEES, CARL SORENSON, DOING BUSINESS AS KIMBALL
CREAMERY, KIMBALL, NEBRASKA, ET AL., INTERVENERS-
APPELLEES.

219 N. W. 2d 214

Filed June 13, 1974. No. 39275.

Hutton & Garden, for appellant.

Tews & Noren, Herman Ginsburg, Clarence A. H. Meyer, Attorney General, and Ralph H. Gillan, for appellees.

Heard before SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ., and RONIN, District Judge.

SPENCER, J.

This action seeks to have sections 81-263.37 to 81-263.49 and 81-263.81 to 81-263.86, R. R. S. 1943, declared unconstitutional and to permanently enjoin the Nebraska Dairy Products Board from in anywise enforcing said statute. The trial court found the questioned acts constitutional and refused the injunction. Plaintiff, a Nebraska corporation, appealed. We reverse.

We capsulize the plaintiff's contentions that the act is unconstitutional as follows: (1) The act grants the defendants authority which exceeds the constitutional police power provided for the state by the Constitution; (2) the public interest is not so affected that the use of police power by the state is warranted; (3) the act fosters monopolistic milk practices; (4) the act is arbitrary, capricious, and discriminatory in regulating the price of dairy products; (5) the act illegally delegates legislative powers to the Nebraska Dairy Products Board and the Department of Agriculture of the State of Nebraska; and (6) the act illegally deprives the plaintiff of certain constitutionally guaranteed property rights.

Plaintiff, Gillette Dairy, Inc., is the only dairy located in the northeastern part of Nebraska that is presently operating a manufacturing and processing plant. Plaintiff alleges that the milk industry has been closely controlled for many years for the protection of the public health. This, plaintiff concedes, is a proper use of the police power of the state. It argues, however, that the power to control the handling of plaintiff's product for health's sake is entirely different and separate from the attempted control by the state of the business eco-

nomics of plaintiff's business in buying, selling, packaging, and distributing dairy products.

Basically, all milk products by all dairies are the same. Plaintiff argues, therefore, that it is in the public interest that an abundance of wholesome dairy products reach the entire state population in various forms (approximately 50), which the public desires at the least possible cost. Plaintiff supplies the 50 products, but 2 of them account for over 80 percent of its business. Competition requires 50 products, and it is competition based to a large degree on price which attracts the customers to some items.

Plaintiff states its dairy operations are very technical. They are divided into a multitude of processes and services so as to best handle its products to serve the need of its customers. This requires plaintiff to be efficient, not only to meet its customers' needs, but to do so at a competitive price while maintaining a high standard for its products.

Plaintiff is a member of a nationwide association known under the name of Quality Check. To maintain membership in this association plaintiff must not only meet all state and federal standards but also must meet additional stringent standards which the association feels are for the benefit of the consuming public. This membership costs plaintiff many thousands of dollars per year, but is an expense plaintiff feels is justified because it keeps its standard above federal and state legal minimums. Plaintiff maintains this membership to give it an advantage in a competitive market.

Section 81-263.38, R. R. S. 1943, is a declaration of purpose in the adoption of the Dairy Industry Trade Practices Act. It reads: "It is hereby declared that the sale of dairy products is a business affecting the public health and welfare and affected with a public interest. Certain trade practices are now being carried on in the sale of dairy products which are unfair and

unjust, which have already driven numerous firms out of business, and which if continued will jeopardize the public interest in securing a sufficient supply of properly prepared dairy products and in preserving the dairy industry of this state free from monopolistic and anti-competitive influences. It is the purpose of sections 81-263.37 to 81-263.49 and 81-263.81 to 81-263.86 to use the police power of the state in order to promote the public interest so declared by outlawing the continuance of such trade practices."

Section 81-263.39, R. S. Supp., 1972, is a definition of the terms used in the act. It defines cost of a dairy product to a distributor as the minimum basic cost determined under the provisions of section 81-263.84, R. S. Supp., 1972. Section 81-263.40, R. S. Supp., 1972, sets up a dairy industry trade practices fund, and prescribes the duties of the director. It provides that the director shall quarterly set a fee of not to exceed 4 mills for each pound of butterfat contained in dairy products sold for consumption within the state, such fee to be an amount that will permit an adequate administration of the provisions of the act. The fees are collectible quarterly from the first processor of dairy products, but liability therefor shall extend to any distributor thereof.

Section 81-263.41, R. R. S. 1943, defines what shall be considered unlawful practices. Included within these is a provision that it shall be unlawful to sell or offer to sell within the state any dairy product for less than the minimum basic cost established by the board. Section 81-263.42, R. R. S. 1943, prescribes unlawful practices for retailers.

Section 81-263.81, R. R. S. 1943, establishes the Nebraska Dairy Products Board and section 81-263.84, R. S. Supp., 1972, prescribes the duties of the board. Section 81-263.84, R. S. Supp., 1972, so far as material herein, provides: "(1) It shall be the duty of the

board to make a current thorough study of the dairy industry within this state * * * and, based on all relevant information made available to the board, *to determine the minimum basic cost to the distributor, which shall be a weighted average of such costs of distributors and others within this state engaged in processing dairy products sold within this state, and the minimum basic cost to the jobber, which shall be a weighted average of such costs of jobbers, of the various dairy products * * *.* In making such determinations, there shall be considered the distributor cost and the jobber cost which, under any system of cost accounting which is in accordance with sound accounting principles and reasonably adapted to the business of such distributor or jobber, is fairly allocable to each dairy product or the sale thereof to its customers or to a particular class thereof. Such costs shall include, but not be limited to, expenses for labor, administration, rent, interest, depreciation, power, raw and process ingredients, materials, supplies, maintenance of equipment, selling, local and national advertising, trading stamps not in excess of the number given in normal trade, transportation, delivery, credit losses, licenses and other fees, taxes other than income taxes, and insurance. The board shall also determine different costs for the different natural marketing areas which it may find within the state." (Emphasis supplied.)

Section 81-263.88, R. R. S. 1943, of the Nebraska Manufacturing Milk Act, is a declaration of public policy. It provides: "It is hereby recognized and declared as a matter of legislative determination that in the field of human nutrition, safe, clean, wholesome milk for manufacturing purposes is indispensable to the health and welfare of the citizens of the State of Nebraska; that milk is a perishable commodity susceptible to contamination and adulteration; that the production and distribution of an adequate supply of clean, safe, and

wholesome milk for manufacturing purposes are significant to sound health and that minimum standards are declared to be necessary for the production and distribution of milk for manufacturing purposes." Plaintiff has no quarrel with this statement of policy.

The United States Supreme Court in Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, held: "Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty."

It is undisputed that section 81-263.41 (1), R. R. S. 1943, prohibits sales below "minimum basic cost" as established pursuant to section 81-263.84, R. S. Supp., 1972. Minimum basic cost is to be a weighted average of the cost of the distributors and others performing various functions. There is no profit margin considered in the determination of the minimum basic cost.

It is obvious that the actual cost of some producers and distributors will be less than the minimum basic cost, while the actual cost of others will be greater. In both instances the amounts will vary. All, however, will be prohibited from selling below the minimum basic cost set by the board. Plaintiff, who appears to be a concerned and efficient distributor, contends that this act discriminates against it in favor of less efficient distributors. This discrimination exists even though plaintiff does not engage in any unfair trade practices. This discrimination obviously increases as the plaintiff becomes more efficient.

Plaintiff does not contest the right of the Legislature to prevent unfair trade practices such as selling below *actual* cost. It does contend, however, that so long as all sales are above actual cost it should be allowed to increase its sales volume by selling at a profit margin

no greater than that of its competitors. Normally, its greater efficiency will allow it to sell below its competitors and thus increase its sales while still maintaining a competitive profit margin. The act clearly prevents it from doing so, and consequently plaintiff claims this is discriminatory, with the degree of discrimination being more or less directly related to its efficiency versus the inefficiency of its competitors.

Inherent in the vice of forcing plaintiff to sell at the minimum basic cost of the average of its most inefficient competitors is the discrimination it suffers in comparison with some of the national milk chains. Plaintiff's product is displayed along with Meadow Gold and Fairmont, both of which are advertised extensively nationally. If all three products are priced the same, which will the buyer who has not previously tried plaintiff's products select? The answer is obvious.

Efficiency, price, and service are the major competitive advantages small distributors can utilize against distributors with recognizable brand names. Plaintiff, therefore, contends that the act is discriminatory because it abrogates or destroys the major marketing advantage of lesser-known producers (price) while leaving the major advantage of large producers (brand name labeling) intact.

The record conclusively establishes that the dairy industry is now one of the most thoroughly regulated food processing industries in the State of Nebraska. Legislation in the past has achieved safe, clean, wholesome milk products which are indispensable to the health and welfare of the citizens of the state. Regulations to this end are clearly within the police power of the state. The evidence is undisputed that all processors of fluid milk and dairy products pay identical prices for fluid milk under federal milk orders. It is obvious on this record that the cost of production is similar except for efficiency differentials and the difference in

volume purchasing of essential supplies other than the fluid milk.

The public interest expressed is the securing of a sufficient supply of properly prepared dairy products and in preserving the dairy industry of this state free from monopolistic and anticompetitive influences. Plaintiff's evidence would indicate that rather than freeing the state from monopolistic influences it would create monopoly by permitting the large processors to become even larger. It is obvious, regardless of the terms used, that the primary purpose of the act is to establish a price control regardless of the cost of production. If the intent were otherwise a prohibition against each operator selling below his cost of production would permit all producers to compete on an equal basis. In supposedly protecting the public interest it is the public which is caught in the price squeeze promoted by raising the price to that of the average of the inefficient producers.

Plaintiff will be able to sell for a while at an excess profit under this standard. It would seem to be apparent, however, that if its prices must be the same as those of national distributors, its volume will be a great deal less than it would otherwise be because of the prestige of the nationally known brand names. The logical extension of such rationale is that the dairy industry will eventually become a monopoly. It is an anomaly that the Legislature created an antitrust division in the office of the Attorney General to fight monopoly and by this act has promoted the opposite course.

Whether a business is charged with such a public interest as to warrant its regulation is a legislative question in which the courts ordinarily will not interfere. The Legislature may not, however, under the guise of regulation, impose conditions which are unreasonable, arbitrary, discriminatory, or confiscatory.

Such regulations must be reasonable considering the nature of the business and not such as would prevent the carrying on of the business. Boomer v. Olsen (1943), 143 Neb. 579, 10 N. W. 2d 507.

In Lincoln Dairy Co. v. Finigan (1960), 170 Neb. 777, 104 N. W. 2d 227, we said: "A citizen clearly has the right to engage in any occupation not detrimental to the public health, safety, and welfare. Measures adopted by the Legislature to protect the public health and secure the public safety and welfare must have some reasonable relation to those proposed ends. A citizen has a constitutional right to own, acquire, and sell property, and if it becomes apparent that the statute, under the guise of a police regulation, does not tend to preserve the public health, safety, or welfare, but tends more to stifle legitimate business by creating a monopoly or trade barrier, it is unconstitutional as an invasion of the property rights of the individual. The court has also consistently held that the regulation of legitimate business may not be so unreasonable as to result in the confiscation of property and the rights incidental to its ownership. This court cannot give judicial approval to legislation that violates these fundamental principles on any theory that they are permissible under Article I, section 3, of the Constitution of this state, commonly referred to as the due process clause."

This case essentially is not too different from Boomer v. Olsen, *supra*, which involved regulation of private employment agencies. While this case deals with a food product, the regulations presently in effect are sufficient to assure the production and distribution of a wholesome food product. The extension of the police power to price fixing in the instant case is not needed to insure a wholesome product for the general public. Rather, its only effect is to promote the welfare of inefficient dairy processors.

The test in this state for price fixing is at least two-fold: First, devotion to a public use; and, second, circumstances where the public interest requires a monopoly to exist in order to prevent costly duplication of facilities at the expense of the ultimate consumer. As suggested before, the interests of the general public appear to be adequately protected by the present exercise of the police power. Clearly, the second test for price fixing has not been met by the evidence in this case. Actually, the opposite effect conclusively appears.

In Terry Carpenter, Inc. v. Nebraska Liquor Control Commission (1963), 175 Neb. 26, 120 N. W. 2d 374, we said: "In Nelsen v. Tilley, 137 Neb. 327, 289 N. W. 388, 126 A. L. R. 729, this court held: 'The legislature, under the guise of regulation, may not indulge in arbitrary price fixing, the destruction of lawful competition, or the creation of trade restraints tending to establish a monopoly.' "

It is evident from a reading of the act and the record that the primary purpose of the act is price fixing. While the exercise of the police power in the milk industry is essential to assure a wholesome product, price fixing is not essential to attain that end. This raises a question suggested in Terry Carpenter, Inc. v. Nebraska Liquor Control Commission, *supra:* May the Legislature constitutionally confer upon others a right which it does not itself possess? Ignoring for the moment the suggested standards, the law in question is intended to control the price of the products sold by the plaintiff. To the extent that by administrative fiat a business is prevented from efficiently competing on a price basis, then to the extent it can be restricted as to what price it wishes to sell its products, that administrative fiat could result in plaintiff's entire investment being eroded away to profit inefficient producers at the expense of the general public.

A producer such as the plaintiff must grow if it is

to survive, because its static costs (plant, insurance, and equipment costs), remain the same with greater volume, and its lesser price helps obtain more customers. If plaintiff is not allowed to compete and grow, increasing costs will consume it or force the price so high it will lose enough customers to go under or erode away its investment.

By upholding this legislation we would necessarily hold that the Legislature has the power to require every distributor of an essential food product, whether bread, meat, fruit, milk, or otherwise, to sell at a price determined by averaging his costs with those of his less efficient competitors. We do not believe this is in the public interest. It is obvious the public through price control is subsidizing the inefficient distributors.

We conclude the act is unreasonable, arbitrary, and capricious in that it purports to fix a minimum basic cost that bears no relation to, and is not justified by, any requirements of the public interest. We also hold that the act, insofar as it purports to fix a minimum basic cost, discriminates against efficient producers in favor of inefficient producers. Further, the act would tend to foster monopolistic and anticompetitive influences in the industry, contrary to the purposes stated by the Legislature. We therefore conclude the act is an unnecessary and unwarranted interference with individual liberty.

To forbid unlawful trade practices, to require each distributor to sell above his actual cost, would be in the public interest and would protect the distributor. The act makes it the duty of the board to determine the minimum basic cost for the group and not for the individuals. Nowhere does the act provide that it is in the best interests of the public or required by public interest that the board's duty be such as set forth by the act. The Legislature has the power to act in behalf of the public health and welfare, to control the production,

handling, and purity of milk but under the guise of regulation may not indulge in arbitrary price fixing. The sole end result of the board's duty is to establish a noncompetitive price level between distributors of dairy products in Nebraska. It is strictly a milk price law, with the board's ultimate duty to fix that price.

It is fundamental that the Legislature may not delegate legislative authority to an administrative or executive authority. It does, however, have power to authorize an administrative or executive department to make rules and regulations to carry out an express legislative purpose or for the complete operation and enforcement of a law within designated limitations. It is fundamental, however, that in the legislative grant of power to an administrative agency, such power must be limited to the express legislative purpose and administered in accordance with standards described in the legislative act. See Lincoln Dairy Co. v. Finigan (1960), 170 Neb. 777, 104 N. W. 2d 227. In that case we held: "The limitations of the power granted and the standards by which the granted powers are to be administered must, however, be clearly and definitely stated. They may not rest on indefinite, obscure, or vague generalities, or upon extrinsic evidence not readily available."

With regard to the board, the expressed legislative purpose is clear. The board is to establish the minimum basic cost to the distributor and jobber which minimum basic cost shall be a weighted average of "such cost," of distributors and jobbers. The board is composed of seven members: Two shall be distributors, two shall be retailers, and two shall be Grade A milk producers. The other member shall represent the general public and have no connection with production, processing, distribution, or selling dairy products in any manner. If the purpose of the act is to protect the interests of the public, is one of seven board members adequate for that purpose?

Plaintiff asserts the term "minimum basic cost" is vague and uncertain, and constitutes an unconstitutional delegation of legislative authority to an administrative board. Plaintiff argues: "The Board having no statutory guideline is unable administratively to arrive at the cost decision ordered by the Act because the Act provides only a few vague generalities whereby honest prudent men with honest differences of opinion could come up with a multiplicity of answers which would not honestly relate to the true picture and would not be in or for the best interests of the general public nor for the best interests of the dairy industry or dairies individually."

The act does provide what costs shall be included, but does not limit the board to the items specified. The minimum basic costs are to be a weighted average of the cost to the distributors, etc. In making that determination it may do so under any system of cost accounting which is in accordance with sound accounting principles and reasonably adapted to the respective businesses. Are these definitely sufficient standards which can be easily measured and uniformly applied?

Defendants' evidence would indicate that the term "weighted average" is regularly used in accounting practice, and is clear in meaning. It is not, however, defined to indicate how or by what means the averages are to be weighted. Webster's New International Dictionary (2d Ed.), p. 2899, defines the term as follows: "Statistics. An average of the values of a set of items to each of which is accorded a weight indicative of its frequency or relative importance; in forming the average, the value of each item is multiplied by its weight and the total of these products is divided by the sum of the weights." Weighted averages may be necessary to determine minimum basic costs, but that does not mean that minimum basic costs themselves are necessary, adequate, or fair.

The other term questioned by plaintiff is "sound accounting principles." It suggests that it would be

impossible to pick any group of individuals who would uniformly interpret what constitutes sound accounting principles for the dairy industry. While the standards used in the act leave something to be desired, we do not need to hold that they are so vague and uncertain that knowledgeable individuals will not understand what is meant by the terms.

For the reasons stated, we find the minimum basic costs provisions of the questioned act to be arbitrary, discriminatory, and demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty.

The judgment of the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion.

REVERSED AND REMANDED.

WHITE, C. J., took no part in the consideration or decision of this case.

CLINTON, J., dissenting.

I respectfully dissent from the opinion of my colleagues. It appears to me that the majority opinion judges not the constitutionality of the legislation, but its wisdom. It appears to declare the statute unconstitutional on the basis of subjective economic views as to the wisdom of unfettered competition among milk processors and distributors. The opinion makes assumptions which are either contrary to the evidence or which find no support in the bill of exceptions. It pays lip service to the appropriate principle, to wit: "Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty," but disregards both the presumption of constitutionality and the evidence as well as the Legislature's declaration of purpose. It would attribute to the judiciary the power to estab-

lish classifications by the court itself declaring two classes: "Efficient" and "inefficient" processors and distributors and gratuitously asserts that it is discriminatory as between them. This legislation does not establish such classes nor is there any *evidence* to establish the existence of such classes nor in which hypothetical category the plaintiff falls. Some processors may have costs which are less than others. It does not follow that some are therefore an "inefficient" class. That some processors because of their volume of sales and ability to make "volume purchasing of essential supplies," as is mentioned in the opinion, does not make their competitors "inefficient." It just makes them less able to compete. All this is mere argument accepted by the majority opinion but without support in the record. Such an arbitrary characterization by the court will enable it to declare almost any classification arbitrary and unreasonable.

The only evidence introduced by the plaintiff is that shown in affidavits which are exhibits 13, 14, and 15. The essence of exhibit 13 is expressed in the following conclusion: Therefore plaintiff and his competitors can only compete on the following items: Types of produce packaging, advertising, quality of service, and the shelf price of the finished product. Exhibits 14 and 15 seem to support the conclusion that the 1962 to 1972 gasoline price stayed the same where dairy products went up. The defendants introduced a great deal of evidence pertaining to the necessity of additional legislation. None of which supports the conclusions of the opinion.

The trial court found: "D. The Act is presumed to be constitutional and the evidence presented herein fails to overcome this presumption of constitutionality."

I submit that the statute is not unconstitutional on its face and that the recital in the opinion six separate times that certain key conclusions are either "obvious" or "apparent" are neither obvious nor apparent, have no evidentiary support, and depend on the a priori

acceptance of certain economic views as to what type of competition is desirable in the milk processing and distributing industry and what the effects of the act will be.

The legislative purpose is set forth in part in the statute as follows: "Certain trade practices are now being carried on in the sale of dairy products which are unfair and unjust, which have already driven numerous firms out of business, and which if continued will jeopardize the public interest in securing a sufficient supply of properly prepared dairy products and in preserving the dairy industry of this state free from monopolistic and anticompetitive influences." § 81-263.38, R. R. S. 1943. The opinion recites: "Inherent in the vice of forcing plaintiff to sell at the minimum basic cost of the average of its most inefficient competitors is the discrimination it suffers in comparison with some of the national milk chains." No evidence supports the statement that plaintiff will be forced to sell "at the minimum basic cost of the average *of its most inefficient competitors.*" (Emphasis supplied.) The act itself provides: ". . . to determine the minimum basic cost to the distributor, which shall be a weighted average of such costs of distributors and others within this state engaged in processing dairy products sold within this state, and the minimum basic cost to the jobber, which shall be a weighted average of such costs of jobbers, of the various dairy products." It is the weighted average of the costs of all distributors which is to be determined and not as the opinion recites, "the cost of the average of its most inefficient competitors." Indeed there is nothing in the evidence to enable us to tell where the plaintiff stands in the scale of efficiency except for whatever conclusions one might draw from the fact that the plaintiff appears to have been successful and is growing, and is one of a rapidly decreasing class of processors and distributors.

The record establishes that in 1950 Nebraska had 151

milk processors and ice cream manufacturers; in 1963 that number had dropped to 55; in 1972 the number was 17. These figures are not challenged. It is apparent that under the existing system monopoly is growing and competition is being eliminated. The Legislature concluded and the evidence supports the proposition that this situation resulted from "milk wars" particularly in populous eastern Nebraska. Expert witnesses through affidavit testified that if "milk wars" are allowed to continue they "could destroy many full service dairies with the result that the consumers and dairy farmers would be hurt as well as full service processors in the price war markets." Also: A "completely unregulated market apparently has not worked satisfactorily in Nebraska due to changes in the industry and its economics, the impact created by chainstore merchandizing and producer cooperative processing." And also that producers have been unable to "cope" with this competitive situation, and affiant is of the opinion "that some form of Government regulation is not only necessary to guarantee a supply of fluid milk products for the consumer in Nebraska, but that in the public interest such laws are absolutely necessary."

The majority opinion states: "Plaintiff's evidence would indicate that rather than freeing the state from monopolistic influences it [the statute] would create monopoly by permitting large processors to become even larger." There is not anything in the record to support the above conclusion. The opinion says: "It is obvious . . . that the primary purpose of the act is to establish a price control regardless of the cost of production." Here it would seem the court is playing with words. First, it seems there could have been at least two "primary" reasons for this act, including: (1) The fact that the state had been unable to establish, under the previous statute, a processors "actual" cost and this act creates an easier way to prove violations by making it illegal to sell below a fixed price rather

than actual cost; and (2) a purpose to protect the dairy industry from the loss of more processors. The majority opinion states: "If the intent were otherwise a prohibition against each operator selling below his cost of production would permit all producers to compete on an equal basis." Two comments are pertinent: (1) Apparently making the producer's own cost the basis of determining the violation under previous legislation had not achieved the Legislature's purpose. Thus the pressure for new legislation. (2) It also appears that under the existing system the desired legislative result was not being achieved.

The Legislature may be right. It may be wrong. The effect of the majority opinion is to say to the Legislature, "This court knows best."

Regulations and statutes similar to those involved here have long been upheld as being constitutional. Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469 (1933), is the leading case on the point and has been followed many times. The New York Legislature, after extensive hearings, had found that the price of milk being paid New York producers was below the cost of production, and that such conditions if allowed to continue might jeopardize (1) the wholesome nature of the product, and (2) the industry itself, thus ending the supply of a product determined essential to the public health.

The appellant in that case was convicted of violating a portion of the act making the selling of milk at a price below levels established by the administrative board a crime. The appellant first challenged the act on the grounds that it violated equal protection of the laws. The court said: "It is shown that the order requires him, if he purchases his supply from a dealer, to pay eight cents per quart and five cents per pint, and to resell at not less than nine and six, whereas the same dealer may buy his supply from a farmer at lower prices and deliver milk to consumers at ten cents the

quart and six cents the pint. We think the contention that the discrimination deprives the appellant of equal protection is not well founded. For aught that appears, the appellant purchased his supply of milk from a farmer as do distributors, or could have procured it from a farmer if he so desired. There is therefore no showing that the order placed him at a disadvantage, or in fact affected him adversely, and this alone is fatal to the claim of denial of equal protection. But if it were shown that the appellant is compelled to buy from a distributor, *the difference in the retail price he is required to charge his customers, from that prescribed for sales by distributors, is not on its face arbitrary or unreasonable, for there are obvious distinctions between the two sorts of merchants which may well justify a difference of treatment, if the legislature possesses the power to control the prices to be charged for fluid milk.* Compare American Sugar Refining Co. v. Louisiana, 179 U. S. 89; Brown-Forman Co. v. Kentucky, 217 U. S. 563; State Board of Tax Commissioners v. Jackson, 283 U. S. 527." (Emphasis supplied.)

Appellant next challenged the statute on the ground that it violated due process: "The Fifth Amendment, in the field of federal activity, and the Fourteenth, as respects state action, do not prohibit governmental regulation for the public welfare. They merely condition the exertion of the admitted power, by securing that the end shall be accomplished by methods consistent with due process. And the guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained. It results that a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because *the reasonableness of each regulation depends upon the relevant facts.*" (Emphasis supplied.)

The court noted that under the milk order there questioned the New York Legislature recognized differences in underlying cost should be reflected in the price charged. "In the order of which complaint is made the Milk Control Board fixed a price of ten cents per quart for sales by a distributor to a consumer, and nine cents by a store to a consumer, thus recognizing the lower costs of the store, and endeavoring to establish a differential which would be just to both. In the light of the facts the order appears not to be unreasonable or arbitrary, or without relation to the purpose to prevent ruthless competition from destroying the wholesale price structure on which the farmer depends for his livelihood, and the community for an assured supply of milk."

We here interject that the legislative determination that the welfare of the milk producers requires the preservation of substantial number of milk processors is not patently unreasonable or arbitrary.

Regarding the question of due process, the court, in Nebbia v. New York, *supra*, continued: "So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. *The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court functus officio.* 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' Northern Securities Co. v. United States, 193 U. S. 197, 337-8. And it is equally clear that if the

legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. *With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal.* The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power." (Emphasis supplied.)

The matters involved come clearly within the legislative purview. The legislation treats all processors and distributors the same. The regulation is not "demonstrably irrelevant to the policy the Legislature is free to adopt." Nebbia v. New York, *supra.*