WALTER V. ESCHER V. STATE OF NEBRASKA.
1 N. W. (2d) 322

FILED DECEMBER 5, 1941. No. 31058.

*Dryden, Dryden & Jensen,* for plaintiff in error.

*Walter R. Johnson, Attorney General,* and *Clarence S. Beck, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

SIMMONS, C. J.

Defendant Escher, Charles B. Morearty and Zazel I. Alban were charged with conspiring to commit a felony, to wit, embezzlement. Escher was tried separately and convicted. He appeals.

The indictment charges that the three parties named were on February 27, 1936, officers and agents of the United Securities Corporation, and that beginning about February 27, 1936, and continuing until September 23, 1937, they did by a series of acts in furtherance of said conspiracy take into their possession money and property of said corporation with intent to defraud said corporation, convert to their own use and embezzle said money and property.

The trial was a lengthy one. The bill of exceptions consists of some 1,500 pages of testimony and copies of exhibits, together with a large container of exhibits, in all several hundred in number. Copies of many exhibits offered and received or offered and rejected are set out in the bill of exceptions. In several instances these exhibits, some of which are typewritten documents of many pages, are copied into the record, not once but several times. There is no excuse for this practice. Reporters should not do it; attorneys should protest it; and trial courts should protect the litigants from such a record. It adds needlessly to the expense of an appeal, increases the work of examin-

ing a record in this court, and serves no purpose save the enrichment of the reporter.

The United Securities Corporation, hereinafter called the corporation, was organized in 1935. Its stock was sold to investors. Escher was a salesman engaged in that effort. It appears he was also a stockholder in the corporation. Sometime prior to February 3, 1936, Escher conceived the idea of gaining control of the corporation from its then officers. Escher employed Morearty as his attorney. Proxies for the stockholders were drafted, and Escher was instrumental in securing their signature, naming Morearty as proxy with broad powers. At the annual meeting February 3, 1936, Morearty, one Onken and Alban were elected directors, although Morearty and Alban were not stockholders. Morearty was elected president, Onken vice-president, and Alban secretary-treasurer. Some difficulty was encountered by the new officers in securing possession of the books, records and property of the corporation. But this difficulty was adjusted by a settlement in which, among other things, the old officers became the owners of the office furniture and fixtures of the corporation. Morearty's office then became the office of the corporation. The new board gave Morearty broad powers in handling the affairs of the corporation and dealing with its assets. His salary was fixed at $75 a week. The corporation at that time had possession of some negotiable stock that its officers had secured from two Iowa women. This stock had been pledged for a loan to the corporation. It had also a block of stock in an Iowa corporation, then in receivership, but which was of material value. Immediately after gaining possession of the property, Morearty and Escher began a series of transactions over a period of months that resulted in the corporation's assets being first converted into cash, and then transferred to Escher and Morearty, or a corporation which Morearty organized and controlled. From February, 1936, to May, 1937, the business of the corporation was largely dealings with Escher and Morearty's corporation. But little other business

was done. When the new officers gained control of the corporation, it had $88 in cash in its bank account. Morearty and Escher went to Iowa to find out the facts about the ownership of the Iowa securities from the two women who had trusted the former officers. The expenses of this trip were paid from corporation funds. They came back and although the debt to the bank, for which the securities were pledged, was not due, these securities were ordered sold, the debt liquidated, and the difference of over $3,000 was placed to the credit of the corporation in its bank account. Next Escher was issued a corporation check for $500, and he gave his unsecured note to the corporation.

Then the stock in the Iowa corporation was sold for some $20,000, and although Morearty seems to have closed the deal, he testified that Escher made the contacts, and in any event Escher was paid $1,004.27 commission on the sale. Escher deposited the check representing this payment in a Lincoln bank, withdrew $452, and shortly thereafter Morearty deposited $452 "currency" in his Omaha account. Morearty admitted receipt of the money and testified that it was an attorney's fee paid him for services to Escher in securing control of the corporation. A number of other checks were issued to Escher for various amounts and his unsecured notes were taken payable to the corporation.

Also, Escher would purchase securities of debatable value, and sell them to the corporation, usually at a profit to himself. These securities were taken by Morearty without more than a casual investigation as to their actual value. The corporation then sold them back to Escher at a 5 per cent. book profit to the corporation, and Escher gave the corporation his unsecured promissory notes in payment. Escher then sold the stock to other purchasers, in at least one instance at a price materially less than the purchase price. The net of these transactions was that Escher got the stock and the profit to him, and the corporation got his notes, unsecured and not collected. In at least one of these stock transactions Escher did not deliver the stock,

although he had been paid for it, and later bought it back, although the corporation never had had it. In the main the records of the company disclosed these transactions, although in at least one instance it is admitted that a "loan" of $500 was included in and carried on the books as a part of the purchase price of stocks.

Morearty also organized an investment corporation that seems to have had one or more stores in California. Escher was a salesman for the stock in that corporation. Three United Securities Corporation checks totaling $2,000 were issued to the manager of the California store, and the United Securities Corporation received in return therefor stock in the Morearty corporation. Morearty repurchased some of the stock in his investment corporation from dissatisfied stockholders and gave his personal check in the sum of $960 therefor and immediately issued a United Securities Corporation check to "cash" for the same amount which he, Morearty, indorsed and deposited, so that that stock got into the ownership of the corporation. A total of $2,960 of the corporation's money went out for stock in Morearty's investment corporation.

Throughout this period Morearty claims that he was working on a number of big deals which would have been to the great profit of the corporation; only one of them materialized to the actual profit of the corporation. Escher also had big deals, one of which was the refinancing of a corporation in Lincoln. By an instrument dated September 8, 1936, Escher and the corporation recited this refinancing agreement and the corporation agreed to advance Escher funds to cover his costs in carrying out the contract, and Escher agreed to give his notes therefor and to assign to the corporation his profits from the refinancing deal and to collateralize his then indebtedness to the corporation by the assignment of profits and in addition to pay the corporation a bonus of 2 per cent. of his gross profits on the refinancing deal. The assignment is attached to the instrument.

Throughout all of these transactions the corporation paid

Morearty's expenses, Escher's expenses, Morearty's salary and a part of his office expense, etc. All checks were signed by Alban and countersigned by Morearty.

A 5 per cent. dividend was paid in January, 1937, although the corporation at that time was showing an operating loss of a considerable amount.

Without attempting to detail each transaction, it may be said that the evidence shows that Escher and Morearty were working together in many, if not all, of these transactions, so that before May of 1937 the entire assets of the corporation were dissipated; and in September, 1937, Morearty resigned and recommended the liquidation of the corporation and turned its assets over to the vice-president. The vice-president does not seem to have comprehended what was going on and does seem to have trusted Morearty and Escher.

It should be said here that Alban's connection with these transactions appears to be that she was a secretary in Escher's Lincoln office, and that her only affirmative action was to sign the checks as secretary-treasurer. These checks, it appears, were often, if not always, signed by her in advance of their issuance and countersigned by Morearty when issued, so that Morearty controlled the actual issuance of the checks.

The defense was that Escher was not an employee or officer or agent of the corporation and could not be an embezzler; that no embezzlement occurred; that the transactions were loans, and the sale and purchase of stock, and payment of commission earned, and were all made in good faith; and further that Escher had secured the corporation by the assignment of his profits from the Lincoln refinancing deal; and that there was no criminal intent. It may be said that, so far as this defense relies upon facts, the jury's verdict disposes of those contentions contrary to Escher, and there is ample evidence in the record to sustain their conclusion in that regard.

Defendant's first proposition is that in a case of this kind it is necessary for the state to prove a felonious intent. As

we read this record that intent was clearly established. These men played fast and loose with the money of other people. They looted this corporation. Clearly the jury looked beyond the books and records of the corporation, and determined that the things which they did and the results which they accomplished were the acts of conspirators motivated and directed with the felonious intent which the indictment charges. Their declarations of good faith and innocence were disbelieved by the jury when weighed as against the things which they did.

Escher next contends that the trial court erred in refusing to permit the introduction of documentary and other evidence which, he contends, would have proved the absence of a criminal intent. The trial court admitted in evidence the agreement between Escher and the corporation dated September 8, 1936, to which reference is made in the statement of facts. The trial court refused to admit in evidence proof of a refinancing proposal made by Escher and accepted by the Lincoln corporation in February, 1937; its performance by Escher; its breach by the Lincoln corporation; and testimony of lawyers that Escher had a valid recoverable claim for some $19,000. We do not consider that the trial court erred in denying the admission of this testimony. It must be remembered that the defendant was charged with having entered into a conspiracy with others to embezzle. That conspiracy, as the state's evidence shows, was formed and overt acts committed long before the refinancing agreement was made with the Lincoln corporation. The felonious intent had to exist when the conspiracy was formed and the acts done. Proof that subsequent to commission of the crime Escher had earned money, which if collected and which if paid to the corporation would have restored in part its looted assets, does not prove the absence of a criminal intent when the crime was committed. The trial court properly refused to permit the jury's attention to be diverted from the peculation charged to Morearty and Escher to a controversy between Escher and the Lincoln corporation.

Defendant next argues that the trial court erred in giving instruction No. 4: "With reference to the crime of embezzlement charged, you are instructed that a statute of the state of Nebraska provides, with reference thereto, in substance, as follows: 'If any *person,* agent * * * factor or commission agent of any private person or any co-partnership, except apprentices and persons within the age of eighteen years, or if any officer * * * agent, clerk, servant, factor, or commission agent of any incorporated company or joint stock company, including all persons employed or commissioned by any employer, corporate or private, shall embezzle or convert to his own use,'" etc. The statute, section 28-544, Comp. St. 1929, to which the instruction refers, begins as follows: "If any *clerk,* agent, attorney at law, servant, factor or commission agent of any private person or any copartnership, except apprentices and persons within the age of eighteen years, or if any officer, attorney at law, agent, clerk, servant, factor or commission agent of any incorporated company or joint stock company, including all persons employed or commissioned by any employer, corporate or private, shall embezzle or convert to his own use, fraudulently take or make away with or secrete with intent to embezzle or fraudulently convert to his own use, without the assent of his or her employer or employers, or the owner or owners thereof, any money, goods, rights in action or other valuable security or effects whatever, belonging to any persons, body politic or corporate, or which is partly the property of any other persons, body politic or corporate, and partly the property of such officer, attorney at law, agent, clerk, servant, factor or commission agent of any incorporated company or joint stock company, including all persons employed or commissioned by any employer, corporate or private, which shall have come into his or her possession or care," etc. It is noted that the trial court in the opening clause used the words "If any person," whereas the words of the statute are "If any clerk." The argument here is that the statute limits to certain defined classifi-

cations those who can commit the crime of embezzlement, whereas the court by the word "person" used an all-inclusive word, broader than the statute, and thereby included in the category of those who could commit the offense persons not named in the statute. It should be pointed out that the statute includes in the classifications also "all persons employed or commissioned by any employer, corporate or private." The clause as stated by the court, standing alone, is confusing, for it reads "If any person * * * of any private person or any copartnership * * * shall embezzle," etc. However, it could not have misled the jury, for there was no embezzlement from "any private person or any copartnership" charged or proved. The embezzlement charged and proved was from an incorporated company, and as to that the instruction appears to properly recite the statute.

Defendant next cites *Hamilton v. State,* 46 Neb. 284, 64 N. W. 965, and argues that the evidence in this case establishes a debtor and creditor relationship between the defendant and the corporation, that that alone is not sufficient to sustain a conviction, and that under the instructions the jury could have found a verdict of guilty based upon that relationship alone. We do not so read the instructions, and the defendant does not point out the basis of this contention. Morearty was a lawyer, Escher a licensed and experienced broker. They knew what they were doing. This evidence shows much more than a mere relationship of debtor and creditor. There is ample evidence to support the conclusion that the giving of the notes and the bookkeeping devices set up were but blankets of apparent legality under which the consummation of their conspiracy and the looting of this corporation took place.

Defendant next states: "An instruction which recites some of the essential elements of the crime charged and omits others, and tells the jury that the things recited in the instructions would constitute the crime is erroneous and constitutes reversible error. We refer to instruction number five given by the court. The court says that if the

agent knowingly appropriates money of his principal to his own use, it is embezzlement within the spirit as well as the letter of the law. At this point the court should have said, 'knowingly with the intent to embezzle or fraudulently convert the money.' " The instruction is its own best answer to this complaint. The instruction in full is: "To constitute embezzlement there must be a fraudulent intent to deprive the owner of his money and to appropriate the same. This element must, like any other element in the case, be proved by the evidence beyond a reasonable doubt. Every sane person is presumed to intend the natural and probable consequences of his voluntary acts. To determine the intent of the defendant in this case, you are to examine all the circumstances, testimony and evidence introduced in the case. The gravamen of the offense known as embezzlement is the intent. There must be criminal intent, but this intent must of necessity be gathered from the acts of the agent and the circumstances surrounding the particular case, and if the agent knowingly appropriates money belonging to his principal to his own use, even though at the time he does so he intends to restore it, it is embezzlement within the spirit as well as the letter of the law." Not only does the court in the quoted instruction point out the necessary element of the intent, but repeatedly throughout these instructions that element is not only stated but stressed. There is no merit in this contention.

The defendant next contends that the court erred in refusing to give a requested instruction and charges that under the instructions of the court it is possible for the jury to believe the defendant guilty of embezzlement, although they might not be of the opinion that there was any conspiracy. The answer to this is that the court gave an instruction requested by the defendant as follows: "You are instructed that in this case your first duty is to determine whether or not a conspiracy, as alleged in the indictment, has been proved by evidence beyond a reasonable doubt. The sole and only crime charged is a conspiracy

to embezzle 19 certain specific items of funds and property, as set forth on the 2d and 3d pages of the original indictment, and in this connection you are instructed that the conspiracy is the gist of the action and must be proved by evidence beyond a reasonable doubt before it is competent and proper for you to consider any of said 19 items aforementioned which are set out as acts done in furtherance of the alleged conspiracy. These acts are known in the law as overt acts and if you find from the evidence that the State has failed to prove the conspiracy as alleged by evidence beyond a reasonable doubt independent of the proof of the alleged overt acts, then you are to acquit Walter V. Escher of the crime charged."

Defendant in his "review of the evidence" makes a number of references to rulings of the trial court on the rejection and admission of evidence. These, while not specifically assigned as error, have been considered along with the assignments discussed, in the light of the statutory rule that "No judgment shall be set aside, or new trial granted, or judgment rendered, in any criminal case on the grounds of misdirection of the jury, or the improper admission, or rejection of evidence, or for error as to any matter of pleading or procedure, if the supreme court, after an examination of the entire cause, shall consider that no substantial miscarriage of justice has actually occurred." Comp. St. 1929, sec. 29-2308.

Prejudicial error has not been found and no substantial miscarriage of justice has occurred.

The judgment of the trial court is

AFFIRMED.