STATE OF NEBRASKA, APPELLEE, V. MARVIN E. COPPLE,
APPELLANT.

401 N.W.2d 141

Filed February 13, 1987.    No. 85-470.

David L. Herzog, P.C., for appellant.

Robert M. Spire, Attorney General, Laura L. Freppel, and Lynne R. Fritz, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

SHANAHAN, J.

The information in the district court for Lancaster County charged Marvin E. Copple with two counts of theft in violation of Neb. Rev. Stat. § 28-511(1) (Reissue 1985), alleged to have occurred as a result of Copple's receipt of $500,000 from Commonwealth Savings Company in reference to real estate purchased by Commonwealth. A jury found Copple guilty on both counts of theft. We affirm.

Commonwealth is a Nebraska corporation licensed as an industrial loan and investment company with five members of its board of directors. Marvin Copple owned and operated a real estate investment and development company and was also a vice president and director of Commonwealth from 1978 to

1981. During those same years, Marvin's father, S.E. Copple, was Commonwealth's majority shareholder, president, and chairman of the board of directors. S.E. Copple, personally or individually, and Commonwealth had been involved in real estate development in excess of 20 years.

In November 1983 the Nebraska Department of Banking and Finance forced Commonwealth into receivership. As a result of subsequent State investigation of Commonwealth's collapse, the two theft charges were filed against Marvin Copple on January 12, 1984.

On May 10, 1984, acknowledging that Copple was under investigation regarding Commonwealth, the State, the United States, and Copple agreed to dispose of all possible criminal charges as follows: Copple would cooperate in all investigations and would testify truthfully; the federal government would file no charge against Copple; the State would file no additional charge against Copple but was entitled to continue prosecution of the two theft charges pending against Copple; and nothing restricted the State's use of "any relevant evidence within [the county attorney's] possession, providing such evidence was not derived, either directly or indirectly, from information provided by MARVIN COPPLE in performance of the terms of this agreement." On February 19, 1985, Copple filed a motion for a hearing at which the State would be required to demonstrate that all the State's evidence, to be adduced at trial, was derived independently from information supplied by Copple pursuant to the May 10, 1984, agreement with the governments. As authorized by Neb. Rev. Stat. § 29-822 (Reissue 1985), Copple then filed, on February 25, a motion to suppress all evidence "derived either directly or indirectly from the information provided by" Copple. As a basis for his motions, Copple relied on *Kastigar v. United States*, 406 U.S. 441, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972), in which the U.S. Supreme Court held that, after a grant of immunity under 18 U.S.C. § 6002 (1982) (immunity from prosecution of a witness for any offense to which judicially compelled testimony relates), the government must show that its evidence is not tainted, viz, must establish that the prosecution " 'had an independent, legitimate source for the disputed evidence.' " 406

U.S. at 460. The district court determined that a *Kastigar*-type hearing was unnecessary but heard and denied Copple's motion to suppress, finding that "the State has made a prima facie showing that evidence it intends to introduce has been derived from independent sources, and said evidence has not been derived either directly or indirectly from information given the State by the defendant." Trial commenced on March 6, 1985.

In 1974 Phillip Stettinger purchased about 80 acres of land at the southeastern edge of Lincoln. Stettinger's land was zoned as residential property sometime in 1978 or 1979, and there was a preliminary plat approved in 1979 for "Stettinger Addition." Unable to obtain financing for development of the land, Stettinger decided to sell.

In January 1980 Stettinger contacted Bernie Hardesty, a real estate agent, to find a buyer for 67 acres of the Stettinger tract. Hardesty, who had previously sold developable land to Marvin Copple, contacted Copple in January 1980 concerning possible purchase of the Stettinger property. Stettinger delivered a plat of the tract to Copple's office. Several days later, Copple met with Hardesty and orally indicated he would buy the Stettinger property for $600,000. On January 25 Copple contacted Jack Tuma, an engineering consultant, for preliminary engineering work on the Stettinger land. After a second meeting with Hardesty, Marvin Copple called his father, S.E. Copple, to "seek his wisdom and his advice and see what he thought of the deal." Hardesty died on February 20, 1980. Marvin Copple never signed an agreement to purchase the Stettinger property.

Marvin Copple and S.E. Copple discussed prospects for the Stettinger tract. S.E. Copple expressed an interest in buying the property, explaining that he had a prospective purchaser for lots in the area of the Stettinger tract and that "when Marvin told me about [Stettinger's land] I wanted to buy it right away for Commonwealth." Marvin and S.E. Copple testified that they believed profit from the development of the Stettinger tract would exceed $1 million. Although they reached no agreement at their initial conference regarding Stettinger's land, Marvin and S.E. Copple again met a few days later and orally agreed that Marvin Copple, in exchange for Commonwealth's payment of $500,000 to Marvin, would allow Commonwealth

to acquire Marvin's "right" to purchase the Stettinger property. Additionally, Marvin agreed to supervise development of the Stettinger land into "buildable lots." (Apparently, "buildable lots" were those developed to a stage appropriate for construction.) That agreement between Marvin and S.E. Copple was never reduced to writing.

On February 1, 1980, Phillip and Virginia Stettinger and S.E. Copple, as president of Commonwealth, signed an agreement for sale of the Stettinger land to Commonwealth. A "final purchase agreement" was signed on May 3 by Stettingers and Commonwealth. This second agreement did not substantially alter the agreement of February 1, that is, the price and schedule of payments remained the same. The purchase price for Stettinger's 67 acres was $600,000. After Commonwealth bought the Stettinger property, Marvin Copple had some contact with the land, such as deciding where to "push more dirt" on the parcel, but from May 1980 Marvin had no substantial contact with the real estate. In October 1980 Commonwealth, by written agreement, sold 40 of the 67 Stettinger acres to Landco, Inc. S.E. Copple, Marvin, and Commonwealth had no proprietary interest in Landco, which agreed to purchase 131 lots on the former Stettinger tract at a price of $12,500 per lot, or a total price of $1,637,500, after Commonwealth had certified the lots as "buildable." The Landco agreement had an "escape" clause, namely, if Landco was unable or unwilling to purchase the real estate, Commonwealth's sole and exclusive remedy was retention of $1,000 as earnest money paid to Commonwealth by Landco at signing the agreement. The Landco agreement was not entered on Commonwealth's books until January 1981, when S.E. Copple directed that the Landco transaction be entered to show an account receivable in the amount of $1,637,500.

On January 15, 1981, Marvin received a check for $250,000 from Commonwealth, a payment of a "commission" regarding the Stettinger transaction but not authorized by Commonwealth's directors. Between February 17 and March 24, during an annual examination of Commonwealth, bank examiners told S.E. Copple that the $250,000 payment to Marvin should be documented by a written agreement and

approved by Commonwealth's directors. On March 19 S.E. Copple directed that an "adjusted projected gain" be shown on Commonwealth's books regarding the Landco agreement, namely, $746,924. Another Commonwealth check for $250,000 was issued to Marvin Copple on April 2 as payment of a "commission" regarding the Stettinger property. Marvin cashed both checks and reported those receipts on his income tax return for 1981. Those two checks, each for $250,000 as a "commission," are the basis for the thefts alleged in the information filed against Marvin Copple.

The State called several witnesses who testified about transactions associated with Commonwealth's purchase from Stettingers, the Landco agreement, and the method by which transactions were reflected on Commonwealth's books.

Steve Hull, a certified public accountant, testified that the Commonwealth-Landco agreement was not properly recorded on Commonwealth's books, because the anticipated profit on that transaction was not consistent with generally accepted accounting principles. According to Hull, the anticipated profit on the Landco transaction was too remote. In Hull's opinion the only profit which could properly be shown on Commonwealth's books was Landco's $1,000 payment of earnest money.

Ray Hill, city planner for Lincoln, testified about the number of vacant lots on December 31, 1979, near the Stettinger tract purchased by Commonwealth. In 16 developments examined by Hill, the number of vacant lots ranged between 9 percent and 100 percent. Of 1,935 lots in the vicinity of the Stettinger tract, 1,205, or 62 percent, were vacant.

Richard Keith, vice president of a real estate appraisal and consulting firm which rendered financial analyses of subdivisions in Lincoln, conducted a financial analysis of the Stettinger land at February 1, 1980. In his opinion Keith concluded that Commonwealth's proposed development of the Stettinger property was not financially feasible in view of the $500,000 payment to Marvin Copple, because cash-flow on the Stettinger tract showed a net loss exceeding $55,000. Keith also testified that the fair market value of the Stettinger tract on

February 1, 1980, was $600,000.

John Maenner, a licensed realtor and real estate developer from Omaha, testified that, in the real estate development industry on February 1, 1980, profits customarily were not paid at commencement of a development, but were paid when earned during the course of a subdivision's development.

Richard Obert, president of a mortgage banking and real estate financing company, testified that, in accordance with custom and usage throughout the industry in 1980 and 1981, a developer took his share of profits at or near the completion of a land development project. Obert also testified that, throughout the industry, a financial institution's officer or director would not compete directly with that financial institution, and if an officer or director had a business opportunity in an area of business normally conducted by the financial institution, the officer or director had the obligation to turn the property over to the institution and would then receive incentive compensation or a bonus after the institution had received any profit from the opportunity relinquished by the officer or director.

During direct examination of S.E. Copple, called as a State's witness, the prosecutor asked whether S.E. Copple had informed Commonwealth's board of directors about purchase of the Stettinger property and payment of $500,000 to Marvin Copple. On the basis of relevance Marvin Copple objected, and a bench conference was held out of the jury's hearing. In the course of that conference, the court remarked to Marvin Copple's counsel: "You haven't made an objection as to hearsay." Marvin Copple's attorney responded: "Hearsay objection, Your Honor, that would be my objection as long as we're here at the side bar." The court and counsel meticulously reviewed evidence adduced to that point in the trial, and the court concluded that the State had shown a prima facie case that a conspiracy existed between S.E. Copple and Marvin Copple. The court then overruled Marvin's objections, and S.E. Copple testified that he had never informed Commonwealth's board of directors about the agreement to pay Marvin $500,000 in connection with the Stettinger property. S.E. Copple also testified that there was no record of

any directors' meeting reflecting the prospective purchase of Stettinger's property and payment of $500,000 to Marvin.

Copple alleges his conviction is invalid, because: (1) Section 28-511(1) is unconstitutional as an overbroad or vague statute; (2) The trial court should have dismissed the proceedings on account of the State's violation of its agreement concerning information to be used in prosecution of Copple; (3) S.E. Copple's testimony about his withholding information from Commonwealth's board of directors was inadmissible because a conspiracy had not been established to authorize admission of such testimony; (4) The trial court improperly admitted into evidence irrelevant testimony and testimony in the form of an opinion from a person who did not qualify as an expert witness; (5) There was misconduct by the prosecutor; (6) There were erroneous instructions to the jury; and (7) The trial court failed to grant a mistrial.

## CONSTITUTIONALITY OF § 28-511

Copple asserts that § 28-511 is unconstitutional because that statute is overbroad and vague in violation of the due process clauses of the U.S. Constitution and the Nebraska Constitution. The State argues that Copple lacks standing to challenge constitutionality of § 28-511.

Section 28-511 states in pertinent part: "(1) A person is guilty of theft if he or she takes, or exercises control over, movable property of another with the intent to deprive him or her thereof."

We note that "vagueness" is a constitutional vice conceptually distinct from "overbreadth." An overbroad statute need lack neither clarity nor precision, and a vague statute need not reach constitutionally protected activity. See *State v. Sinica*, 220 Neb. 792, 372 N.W.2d 445 (1985) (citing L. Tribe, American Constitutional Law § 12-28 (1978)). We have stated that a statute may be constitutionally infirm if the statute is vague or overbroad. *State v. Frey*, 218 Neb. 558, 357 N.W.2d 216 (1984). "Moreover, an enactment which is clear and precise, and therefore not vague, may nonetheless fail to pass constitutional muster by virtue of being overbroad in the sense that it prohibits the exercise of constitutionally protected

conduct, such as the exercise of first amendment rights." 218 Neb. at 561, 357 N.W.2d at 218-19. In *State v. Frey, supra,* we enunciated the standard to determine whether a party has standing to bring a constitutional challenge based on a statute's overbreadth or vagueness:

> [I]n a facial challenge to the overbreadth and vagueness of a law, that is, in this context, a claim that the law is invalid in toto and therefore incapable of any valid application, our first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. We are to then examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, uphold the challenge only if the enactment is impermissibly vague in all its applications. In order to have standing to challenge a vague statute, one must not have engaged in conduct which is clearly proscribed by the statute, and cannot complain of the vagueness of the law as applied to the conduct of others.

218 Neb. at 561-62, 357 N.W.2d at 219.

Irrespective of standing to challenge a statute for vagueness, an individual may have standing to assert that a statute is overbroad when such statute reaches a substantial amount of constitutionally protected conduct. See *State v. Sinica, supra.* In determining whether standing exists for a facial challenge to a statute as overbroad, a court must first determine whether the statute reaches a substantial amount of constitutionally protected conduct. *State v. Sinica, supra; State v. Frey, supra; State v. Groves,* 219 Neb. 382, 363 N.W.2d 507 (1985). If the statutory proscription does not reach a substantial amount of constitutionally protected conduct, there is no standing to challenge a statute on the basis that the statute is overbroad, and such challenge must fail. *State v. Frey, supra; State v. Groves, supra; State v. Merithew,* 220 Neb. 530, 371 N.W.2d 110 (1985). Copple argues that his conduct, as a business transaction wherein he received payment for transfer of his right to purchase and develop real estate or was paid a commission concerning a land transaction, is constitutionally

protected. The liberty to contract, the right to acquire and sell property in a lawful manner, and the right to conduct lawful business are constitutionally protected rights. See, *United States Brewers' Assn., Inc. v. State*, 192 Neb. 328, 220 N.W.2d 544 (1974); *Gillette Dairy, Inc. v. Nebraska Dairy Products Board*, 192 Neb. 89, 219 N.W.2d 214 (1974); *Skag-Way Department Stores, Inc. v. City of Grand Island*, 176 Neb. 169, 125 N.W.2d 529 (1964); *Boomer v. Olsen*, 143 Neb. 579, 10 N.W.2d 507 (1943); *Nelsen v. Tilley*, 137 Neb. 327, 289 N.W. 388 (1939). Consequently, we find that § 28-511(1) does reach a substantial amount of constitutionally protected conduct, and, therefore, Copple does have standing to challenge § 28-511(1) for overbreadth as that statute applies to his transactions with Commonwealth.

Copple argues that § 28-511(1) does not contain the word *unlawfully* as a modifier for *takes*, used in the statute, and, therefore, all conduct, both legal and illegal, falls within the prohibition of the statute and is "swept together in one net." Brief for Appellant at 24. We disagree with Copple's assertion that absence of "unlawfully" renders § 28-511(1) unconstitutionally overbroad. Section 28-511(1) proscribes or condemns only that conduct in which criminal intent is present, distinguishing theft from activity which is otherwise permissible as noncriminal conduct. Under § 28-511(1) the prohibited taking or exercising control relates to "movable property of another with the intent to deprive him or her thereof." Such statutory prohibition of § 28-511(1) must be read with other pertinent parts of the Nebraska Criminal Code. Neb. Rev. Stat. § 28-509 (Reissue 1985), the definitional statute pertaining to the crime of theft, in pertinent part provides:

(1) Deprive shall mean:

(a) To withhold property of another permanently or for so extended a period as to appropriate a major portion of its economic value, or with intent to restore only upon payment of reward or other compensation; or

(b) To dispose of the property of another so as to create a substantial risk that the owner will not recover it in the condition it was when the actor obtained it;

. . . .

> (6) Property of another shall mean property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact that the actor also has an interest in the property and regardless of the fact that the other person might be precluded from civil recovery because the property was used in an unlawful transaction or was subject to forfeiture as contraband. . . .

Also, § 28-511(1) must be read with Neb. Rev. Stat. § 28-510 (Reissue 1985): "Conduct denominated theft in sections 28-509 to 28-518 constitutes a single offense embracing the separated offenses heretofore known as larceny, embezzlement, false pretense, extortion, blackmail, fraudulent conversion, receiving stolen property, and the like." Section 28-511(1), when read with §§ 28-509 and 28-510, clearly condemns only conduct in which criminal intent is present and does not condemn any conduct where criminal intent is absent. Of further interest is Neb. Rev. Stat. § 28-518 (Reissue 1985), which defines the grade of various offenses classified as theft, especially subsection (1) of § 28-518: "Theft constitutes a Class III felony when the value of the thing involved is over one thousand dollars." Section 28-518 then distinguishes other grades of theft, ranging from a Class IV felony to a Class II misdemeanor, depending on the "value of the thing involved." See § 28-518(2), (3), and (4). The designation of theft as either a felony or a misdemeanor denotes unlawful conduct. Copple does not indicate any provision in the Nebraska Criminal Code which recognizes a lawful felony or a lawful misdemeanor. We suspect there is probably none. We find that the provisions of § 28-511, when read with §§ 28-509 and 28-510, clearly distinguish unlawful or criminal conduct from conduct which is lawful. Therefore, § 28-511(1) is not unconstitutionally overbroad.

We turn to Copple's contention that § 28-511(1) is vague and, therefore, unconstitutional. To challenge § 28-511(1) on the ground of vagueness, Copple must not have engaged in conduct which is clearly prohibited by the questioned statute and cannot maintain that the statute is vague when applied to the conduct of others. See *State v. Frey*, 218 Neb. 558, 357 N.W.2d 216

(1984). Rather, Copple is entitled to show that the statute, when applied to his particular activity, is vague. We cannot state that business activity involving payment of a commission or for disposition of a right to purchase and develop real estate is clearly proscribed by § 28-511(1). Therefore, Copple does have standing to challenge § 28-511(1) on the ground of vagueness insofar as that statute condemns Copple's conduct as criminal.

> In order to meet constitutional standards of due process, a penal statute must be sufficiently clear so that a person of ordinary intelligence has fair notice of what exactly is forbidden conduct under the act. . . . [I]n construing a penal statute this court will give it an interpretation which meets constitutional requirements if it can reasonably be done. . . . A statute is presumed to be constitutional and unconstitutionality must be clearly established before this court is authorized to declare it void.

*State v. Neal*, 187 Neb. 413, 416, 191 N.W.2d 458, 460 (1971).

In *State v. Sailors*, 217 Neb. 693, 695, 352 N.W.2d 860, 862 (1984), this court stated:

> The test for determining whether a statute is vague is whether it forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application. . . . A statute will not be deemed vague if it uses ordinary terms which find adequate interpretation in common usage and understanding. . . . In determining whether a statute is vague and therefore does not give a defendant adequate notice that his conduct is proscribed, the statute must be examined in light of the conduct with which the defendant is charged. . . .
>
> . . . The prohibition against vagueness does not invalidate a statute simply because it could have been drafted with greater precision. The test is whether the defendant could reasonably understand that his conduct was proscribed by the statute.

As was the basis for his claim that § 28-511(1) is overbroad as the result of "unlawfully" being absent from the statute, Copple contends that § 28-511(1) is vague because the word *unlawfully* is not contained in the body of the questioned

statute. We again disagree with Copple and find that § 28-511(1) is not unconstitutionally vague. Section 28-511(1) employs ordinary language which is found in common usage, easily understood by a person of ordinary intelligence. The term "theft" is commonly used and understood to mean the act of stealing. "Deprive" is another commonly used word and is adequately defined in § 28-509(1). The phrase "property of another" can hardly be misunderstood, especially in view of the definition expressed in § 28-509(6). An essential purpose of a penal statute is to provide notice to the ordinary person concerning conduct which is proscribed as criminal. *State v. Carlson*, 223 Neb. 874, 394 N.W.2d 669 (1986). When a penal statute supplies an ordinary person with notice concerning conduct forbidden as criminal, such statute meets the constitutional standard of due process. See *State v. Neal, supra*. Apparently Copple views the Nebraska Criminal Code as absolutely unrelated statutes which, by design or chance, have been collected in chapter 28 of the Revised Statutes of Nebraska. However, the Nebraska Criminal Code is a systematic statutory statement, defining criminal offenses and prescribing penalties for commission of crimes. All facets of a criminal offense need not be embodied in one statute and that statute alone. Characteristic elements of some, but not all, criminal offenses are specified in a statute within the Nebraska Criminal Code, while another statute within the code may specify a meaning assigned to certain elements of a particular crime, and still other statutes prescribe penalties which may be imposed on conviction of a criminal offense. The result is a statutory synergism, supplying information to the ordinary person about conduct condemned as criminal and punishable in a prescribed form. The statutes contained in the Nebraska Criminal Code no more exist in individual isolation than do the people governed by that code. To an ordinary person, § 28-511(1) supplies fair notice concerning conduct which is condemned as criminal and, therefore, prohibited by the Nebraska Criminal Code. If Marvin Copple intended to deprive Commonwealth of its property, then § 28-511(1) provided adequate and clear notice that Copple's contemplated conduct was forbidden as a criminal act. The question whether

Copple had such criminal intent was, of course, for the jury's determination. *State v. Siers*, 197 Neb. 51, 248 N.W.2d 1 (1976) (intent as an essential issue and question of fact for the jury in an embezzlement trial). See, also, *Escher v. State*, 140 Neb. 633, 1 N.W.2d 322 (1941) (felonious intent regarding a conspiracy to embezzle corporate funds, "looting" the corporation; fact question for jury).

We hold that § 28-511(1) is neither overbroad nor vague and is, therefore, constitutional.

### *KASTIGAR* HEARING

Copple claims the proceedings should have been dismissed because the State used evidence obtained, directly or indirectly, from Copple's information supplied pursuant to the agreement of May 10, 1984.

To support his claim, Copple relies on *Kastigar v. United States*, 406 U.S. 441, 92 S. Ct. 1653, 32 L. Ed. 2d 212 (1972), where the U.S. Supreme Court considered the question whether the U.S. government can compel testimony from an unwilling witness who has invoked the fifth amendment privilege against compulsory self-incrimination after the government had obtained immunity for such witness pursuant to 18 U.S.C. §§ 6002 and 6003 (1982). The *Kastigar* Court reasoned:

> "Once a defendant demonstrates that he has testified, under a state grant of immunity, to matters related to the federal prosecution, the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence." . . . This burden of proof, which we reaffirm as appropriate, is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

406 U.S. at 460.

The Nebraska counterpart to 18 U.S.C. §§ 6002 and 6003 is Neb. Rev. Stat. § 29-2011.02 (Reissue 1985):

> Whenever a witness refuses, on the basis of the privilege against self-incrimination, to testify or to provide other

information in a criminal proceeding before a court or grand jury, the court, on motion of the county attorney or other prosecuting attorney, may order the witness to testify or to provide other information. The witness may not refuse to comply with such an order of the court on the basis of the privilege against self-incrimination, but no testimony or other information compelled under the court's order, or any information directly or indirectly derived from such testimony or other information, may be used against the witness in any criminal case, except in a prosecution for perjury, giving a false statement, or failing to comply with the order of the court.

Copple also relies on *State v. Jones*, 213 Neb. 1, 328 N.W.2d 166 (1982), where this court construed § 29-2011.02 and expressed: "It is clear that immunity statutes are designed to serve as substitutes for the fifth amendment right not to incriminate oneself. Without such statutes no person in a criminal case can constitutionally be compelled to testify." 213 Neb. at 13, 328 N.W.2d at 174.

Copple has misplaced reliance on *Kastigar v. United States, supra,* and *State v. Jones, supra,* which involve statutorily granted immunity. In Copple's case there has been no privilege against self-incrimination invoked by Copple during a criminal proceeding before a court or grand jury. Copple was not judicially compelled to testify but, rather, voluntarily bargained for and entered into an agreement with the State. As observed in *Butler v. State*, 55 Md. App. 409, 418, 462 A.2d 1230, 1234 (1983):

> We should meticulously keep separate and apart the subjects of (1) the conferral of immunity, (2) a plea bargain, and (3) some other bargain involving something other than a plea to a criminal charge. The sources of authority are different. The social purposes are different. The legal incidents are different. The procedural rules are different. Other than the very general notion of some *"quid pro quo,"* the three phenomena are distinct. We only do the law a disservice when we heedlessly blur those distinctions.
>
> The conferral of immunity, which involves no

bargaining, is further removed conceptually from the two types of bargains than they are from each other. To compare immunity to bargaining is truly to compare apples with oranges . . . .

However, the absence of statutorily granted immunity does not mean that the State is exempt from compliance with its agreement regarding immunity and restricted evidence or information.

In *Rowe v. Griffin*, 676 F.2d 524, 527-28 (11th Cir. 1982), the court said:

We note that, under the self-incrimination clause of the fifth amendment, evidence of guilt induced by a government promise of immunity is "coerced" evidence and may not be used against the accused. [Citation omitted.] For purposes of compelling testimony which otherwise would be privileged by the fifth amendment, all that is constitutionally required is a grant of use immunity. [Citation omitted.] . . . We believe that, as a matter of fair conduct, the government ought to be required to honor such an agreement when it appears from the record that: (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.

As stated in *United States v. Carpenter*, 611 F. Supp. 768, 774-75 (N.D. Ga. 1985):

However, the courts have developed a concept of "nonstatutory" immunity whereby the courts will enforce informal or procedurally flawed grants of immunity on equitable grounds. . . . These cases indicate that where the government has entered into an agreement with a prospective defendant and the defendant has acted to his detriment or prejudice in reliance upon the agreement, "as a matter of fair conduct, the government ought to be required to honor such an agreement." [Citing *Rowe v. Griffin, supra.*]

At the hearing on Copple's motion to suppress, the State presented evidence from the special prosecutor who had signed

the May 10 agreement and an officer of the Lincoln Police Department assigned to investigate Commonwealth matters. According to the officer, he was one of four officers who investigated Commonwealth's insolvency. The investigators familiarized themselves with the accounting system utilized by Commonwealth and discussed the system with Commonwealth's comptroller. The investigative task force also subpoenaed Marvin Copple's checking accounts for information pertaining to the Stettinger transaction. The foregoing investigative activity occurred in December 1983 and January 1984, months before Copple signed the agreement with the governments. At a preliminary hearing on February 14, 1984, Copple testified in his own behalf and offered an explanation for the "commission" checks received from Commonwealth. Before Copple signed the agreement of May 10, the State had acquired considerable information regarding various aspects of real estate development. No representative of the State discussed the Stettinger transaction with Marvin Copple.

Under the circumstances, we find that a *Kastigar*-type hearing was not required because there was no statutorily granted immunity as a consequence of judicially compelled testimony, but, at the hearing on Copple's motion to suppress, the district court properly considered the question whether the State had violated its agreement with Copple concerning immunity and restricted evidence. However, we hold that, at such hearing to determine whether the State had violated its agreement for immunity and restricted evidence or information, the State must present a prima facie case that it has fulfilled its agreement with the defendant, that is, demonstrate that the State's evidence, to be adduced at the defendant's trial, was obtained from a source or sources independent of the defendant and not by direct or indirect use of information obtained from the defendant as the result of the defendant's agreement for immunity and restricted evidence or information. In determining the correctness of a trial court's ruling on a motion to suppress, the Supreme Court will uphold the trial court's findings of fact unless those findings are clearly erroneous. *State v. Dixon*, 222 Neb. 787, 387 N.W.2d 682

(1986). See, also, *State v. Beard*, 221 Neb. 891, 381 N.W.2d 170 (1986). "In determining whether a trial court's findings on a motion to suppress are clearly erroneous, the Supreme Court recognizes the trial court as the 'trier of fact' and takes into consideration that the trial court has observed witnesses testifying regarding such motion to suppress." *State v. Dixon, supra* at 795, 387 N.W.2d at 687. The district court's decision, overruling Copple's motion to suppress, is correct.

## TESTIMONY FROM A COCONSPIRATOR

As defined in the Nebraska Criminal Code:

(1) A person shall be guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a felony:

(a) He agrees with one or more persons that they or one or more of them shall engage in or solicit the conduct or shall cause or solicit the result specified by the definition of the offense; and

(b) He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

Neb. Rev. Stat. § 28-202 (Reissue 1985).

However, the information did not allege a conspiracy in violation of § 28-202, but alleged two counts of theft in violation of § 28-511(1).

Marvin Copple contends S.E. Copple's testimony is inadmissible for two reasons, namely, the testimony violated the hearsay rule and was not relevant.

(1) A statement is (a) an oral or written assertion or (b) nonverbal conduct of a person, if it is intended by him as an assertion;

. . . .

(3) Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted; and

(4) A statement is not hearsay if:

. . . .

(b) The statement is offered against a party and is . . . (v) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

Neb. Evid. R. 801 (Neb. Rev. Stat. § 27-801 (Reissue 1985)).

*Conceal* means to hide, secrete, or withhold from knowledge of others; to withhold from utterance or declaration; to cover or keep from sight; to hide or withdraw from observation, cover or keep from sight, or prevent discovery. *Christopher v. Evans*, 219 Neb. 51, 361 N.W.2d 193 (1985). The word *conceal* pertains to affirmative action likely to prevent or intended to prevent knowledge of a fact and has reference to some advantage to the concealing party or a disadvantage to some interested party from whom the fact is withheld. *Christopher v. Evans, supra*.

S.E. Copple's testimony related to his nonverbal conduct in or the act of concealing information from Commonwealth's board of directors in reference to the Stettinger transaction and payments to Marvin. S.E. Copple's nonverbal conduct was not a declaration asserting or demonstrating that a fact was true. Rather, the testimony was evidence of S.E. Copple's deliberate withholding of information for Commonwealth's directors and was not an out-of-court statement offered to prove the truth of the matter asserted. Because the statements of S.E. Copple were made during his testimony at trial and did not have the characteristics of hearsay, the court correctly overruled Marvin's objection (hearsay).

This brings us to Marvin's contention that S.E. Copple's testimony was not relevant.

"Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Evid. R. 401 (Neb. Rev. Stat. § 27-401 (Reissue 1985)).

"The principal element of a conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another." *Hahn & Hupf Constr. v. Highland Heights Nsg. Home*, 222 Neb. 189, 194, 382 N.W.2d 607, 611 (1986). The very nature of a conspiracy requires an element of intent. *United States v. Adderly*, 529 F.2d 1178 (5th Cir. 1976).

Frequently, a conspiracy involves intricate situations and several complex acts which make it difficult to establish, by

direct proof, a conspiracy or conspiratorial intent. Thus, circumstantial evidence may establish existence of a conspiracy or the criminal intent necessary for a conspiracy. See, *State v. McSwain*, 194 Neb. 31, 229 N.W.2d 562 (1975); *State v. Adams*, 181 Neb. 75, 147 N.W.2d 144 (1966).

When a conspiracy has been proved, a conspirator's acts and declarations, in furtherance of the conspiracy, are the acts and declarations of all conspirators and are admissible evidence against the coconspirators. *State v. Adams, supra.* See, also, *State v. Watson*, 182 Neb. 692, 157 N.W.2d 156 (1968). Judge Learned Hand observed: "When men enter into an agreement for an unlawful end, they become ad hoc agents for one another, and have made 'a partnership in crime.' What one does pursuant to their common purpose, all do . . . ." *Van Riper v. United States*, 13 F.2d 961, 967 (2d Cir. 1926).

As we have already noted, a criminal conspiracy requires an "overt act." § 28-202(1)(b). An overt act manifests that a conspiracy is "still at work." *State v. John*, 213 Neb. 76, 328 N.W.2d 181 (1982). Also, an overt act, as something done pursuant to a conspiracy, tends to show a preexisting conspiracy and manifests an intent or design toward accomplishment of a crime. See *State v. John, supra.* An overt act, by itself, need not have the capacity to accomplish the conspiratorial objective and does not have to be a criminal act. See *State v. John, supra.* Silence, which is designed to conceal, may indicate an intention to conspire and, if intended to facilitate the conspiracy, may be an overt act pursuant to the conspiracy. See *United States v. Eucker*, 532 F.2d 249 (2d Cir. 1976).

In *State v. Bobo*, 198 Neb. 551, 253 N.W.2d 857 (1977), the focal point was a coconspirator's hearsay statement and admissibility of such statement under the coconspirator exception to the hearsay rule, that is, admissibility pursuant to Neb. Evid. R. 801(4)(b)(v). In *Bobo* this court stated:

> To be admissible, the statements of the coconspirator must have been made while the conspiracy was pending and in furtherance of its objects; and if the statements took place after the conspiracy had ended, or if merely narrative of past occurrences, they are not admissible. [Citations omitted.] The coconspirator exception to the hearsay rule

is applicable regardless of whether a conspiracy has been charged in the information or not. [Citation omitted.]

The rule is well established that before the trier of facts may consider testimony under the coconspirator exception to the hearsay rule, a *prima facie* case establishing the existence of the conspiracy must be shown by independent evidence. [Citations omitted.]

(Emphasis supplied.) 198 Neb. at 557, 253 N.W.2d at 861.

Although the coconspirator exception to the hearsay rule is not a determinative issue in Copple's case, we believe the requirement of a "prima facie case," contained in *Bobo* for admissibility of a statement by a coconspirator, is pertinent to the evidential question now before this court: whether S.E. Copple's testimony was admissible as relevant evidence.

The phrase *prima facie* "can probably be defined only in terms of sufficient evidence to permit the trial court reasonably to infer that there existed a conspiracy." *State v. Thompson*, 273 Minn. 1, 17, 139 N.W.2d 490, 503 (1966). See, also, *State v. Daniels*, 380 N.W.2d 777 (Minn. 1986). In *United States v. Trotter*, 529 F.2d 806, 812 n.8 (3d Cir. 1976), a prosecution for conspiracy, the court stated:

The requirement of prima facie proof is less stringent than that of a preponderance of the evidence. The former requires only enough evidence to take the question to the jury whereas the latter requires "proof which leads the jury to find that the existence of the contested fact is more probable than its nonexistence." McCormick, *Evidence* 794 (2d ed. 1972).

We now hold that for admission of a coconspirator's act as evidence against a defendant-coconspirator being tried for a crime other than the conspiracy itself, the trial court must first determine whether the State has proved a prima facie case that (1) a conspiracy existed, (2) the defendant and the witness were members of the conspiracy, and (3) the witness' act was done during and in furtherance of the conspiracy.

We emphasize, however, that there is a distinction between proving conspiracy as a crime, see § 28-202, where proof beyond a reasonable doubt is required, and establishing conspiracy as a prerequisite and a means to achieve admission

of an alleged coconspirator's acts and declarations as evidence, where only a prima facie showing of conspiracy is sufficient.

The judge shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (a) make the interrogation and presentation effective for the ascertainment of the truth, (b) avoid needless consumption of time, and (c) protect witnesses from harassment or undue embarassment [sic].

Neb. Evid. R. 611 (Neb. Rev. Stat. § 27-611(1) (Reissue 1985)).

Nevertheless, whether the State has established a prima facie case of conspiracy, thereby constituting anything within execution or furtherance of the common purpose as the act of every coconspirator, is a preliminary question for the trial court concerning admissibility of evidence. See Neb. Evid. R. 104(1) (Neb. Rev. Stat. § 27-104(1) (Reissue 1985)). Rule 104(1) was the procedure correctly utilized by the trial court in Copple's case. Presentation of the State's evidence in Copple's case consumed 13 days of trial and is spread over 2,563 of the 3,058 pages of testimony contained in a bill of exceptions consisting of 14 volumes, excluding pretrial and posttrial matters. To adduce that quantity of evidence outside a jury's presence and then require repetition of the same admissible testimony before the jury would unduly and unnecessarily prolong what was already a lengthy trial, as cases involving conspiracy are likely to be. Consequently, the prima facie case of conspiracy may be established as a part of and through the evidence presented to the jury concerning the substantive crime charged against the coconspirator-defendant. We have characterized proof of a prima facie case of conspiracy as a preliminary question for the trial court under Neb. Evid. R. 104(1) and a prerequisite for admissibility of a coconspirator's acts, rather than making relevance depend on proof of another fact to be later established during adduction of evidence, a "connecting up," as authorized by Neb. Evid. R. 104(2), which states: "When the relevancy of evidence depends upon the fulfillment of a condition of fact, the judge shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Admission of evidence from a coconspirator, subject to the State's later completing proof of a

prima facie case of conspiracy, presents some procedural problems which may result in unwarranted, or even unfair, prejudice to a defendant, for example, the necessity of a motion to strike evidence conditionally received, a request to withdraw the coconspirator's testimony from consideration by the jury, or an instruction that the jury shall disregard the evidence which has been presented but not linked to a conspiracy. Whatever procedure might seem most appropriate on failure of proof after a conditional admission of evidence, there is an ever-present risk that the court's later instruction may not erase a prejudicial impression on the jury—with the specter of a mistrial. See McCormick on Evidence § 58 (E. Cleary 3d ed. 1984).

At the point in the trial where the State sought introduction of S.E. Copple's testimony about his concealment of or withholding information from Commonwealth's board of directors, there was evidence as follows: S.E. Copple and Marvin were directors and officers of Commonwealth and had reached an agreement in January 1980 regarding Commonwealth's acquisition of the Stettinger real estate, including $500,000 to be paid to Marvin. Marvin's claim on the Stettinger property was, at best, based on an oral contract, and there were no documents embodying any agreement between S.E. Copple and Marvin. Stettinger's property had a market value of $600,000 at the time of sale to Commonwealth on February 1, 1980. Commonwealth's payments to Marvin, that is, the two checks of $250,000 each, were made to Marvin in January and April of 1981. Marvin had minimal contact with the Stettinger property after its acquisition by Commonwealth. The size of the payment to Marvin ($500,000) in relation to the market value of the Stettinger property ($600,000) was an additional circumstance. Finally, there was the collapse of Commonwealth in November 1983, which marked the outer boundary of the conduct contended by the State to be conspiratorial. A trial court's finding that a prima facie case has been established concerning existence of a conspiracy will be upheld unless such finding is clearly erroneous. Cf. *United States v. Posner*, 764 F.2d 1535, 1537 (11th Cir. 1985) (trial court's determination is a "finding of fact which may be

overturned only if clearly erroneous"). Cf., also, *United States v. Arruda,* 715 F.2d 671, 684 (1st Cir. 1983) (in reviewing a trial court's ruling on the showing made by the government for evidence from a coconspirator, "we must accept that court's findings of fact supporting the ruling unless they are clearly erroneous"). In Copple's case there is evidence which supports the district court's finding that the State had established a prima facie case that a conspiracy existed between S.E. Copple and Marvin. The district court's finding of a prima facie case of conspiracy is correct.

When the State established its prima facie case of conspiracy, evidence of S.E. Copple's concealment or withholding information from Commonwealth's board of directors was circumstantial evidence for the jury's consideration in determining whether Marvin Copple, as S.E. Copple's coconspirator, was guilty of theft as charged. See Neb. Evid. R. 401. The admission or exclusion of evidence is a matter within the sound discretion of the trial court, whose ruling on an evidential question will be upheld unless such ruling constitutes an abuse of discretion. *State v. Bostwick,* 222 Neb. 631, 385 N.W.2d 906 (1986). There is no abuse of discretion in the district court's admitting S.E. Copple's testimony as evidence against Marvin.

## RELEVANT EVIDENCE AND TESTIMONY BY EXPERTS

Copple believes that the district court committed reversible error by admitting testimony of Ray Hill, Richard Keith, Richard Obert, and John Maenner, contending that testimony from those witnesses was not relevant.

Hill testified about the weakened condition of the Lincoln real estate market in terms of available vacant lots. Keith expressed his opinion concerning the market value of the Stettinger land and the feasibility of its development. Obert and Maenner testified about the customary manner in which a developer was paid for any profit realized on a real estate development. All that testimony has some tendency to establish the fact that the payments to Marvin Copple were, more probably, subterfuge to siphon funds from Commonwealth and

were thefts rather than earned commissions or profits from a legitimate real estate transaction. Such testimony was relevant and admissible. See Neb. Evid. R. 401. The district court did not abuse its discretion in admitting testimony from the witnesses mentioned. See *State v. Bostwick, supra*.

Next, Copple complains that neither Obert nor Maenner was qualified to testify as an expert witness.

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Neb. Evid. R. 702 (Neb. Rev. Stat. § 27-702 (Reissue 1985)).

Obert was a graduate accountant, actively engaged in the mortgage banking business and financing for real estate developers. Maenner held a degree in business administration, was a licensed realtor in Nebraska and two other states, and was engaged in the real estate "subdivision development business." Whether a witness is qualified as an expert is a preliminary question for a trial court. Neb. Evid. R. 104(1). Determination of a witness' qualification as an expert is a matter within the sound discretion of a trial court, whose ruling will be upheld unless such ruling constitutes an abuse of discretion. See *Schmidt v. J.C. Robinson Seed Co.*, 220 Neb. 344, 370 N.W.2d 103 (1985). We find no abuse of discretion by the district court in its determination that Obert and Maenner were qualified as expert witnesses.

Copple alludes to other possible errors concerning the trial court's ruling on some of his objections, which we find are at least 593 in number, but does not specify which rulings prejudically affected any substantial right of Copple. See Neb. Evid. R. 103(1) (Neb. Rev. Stat. § 27-103(1) (Reissue 1985)). In order that assignments of error as to the admission or rejection of evidence may be considered, the Supreme Court requires that appropriate reference be made to the specific evidence against which objection is urged. *Pulliam v. State*, 167 Neb. 614, 94 N.W.2d 51 (1959). "A party who claims error in a proceeding is required to point out the factual and legal basis that shows the error." *Lemmon v. State*, 173 Neb. 387, 391, 113

N.W.2d 525, 528 (1962). We will not speculate about which rulings of the district court Copple contends are erroneous. See *Bohaty v. Briard*, 219 Neb. 42, 361 N.W.2d 502 (1985). See, also, *Fee v. Fee*, 223 Neb. 128, 134, 388 N.W.2d 122, 126 (1986) ("To be considered by this court, errors must be assigned and discussed in the brief of the one claiming that prejudicial error has occurred. See Neb. Ct. R. of Prac. 9D(1)d (rev. 1983)").

## INSTRUCTIONS

Copple argues that instruction No. 12 is erroneous because the instruction does not define "bona fide or honest claim of right." Brief for Appellant at 44. However, at the conference on prospective jury instructions, Copple's attorney expressly stated that "[d]efendant has no objection to [instruction No.] 12." "We have frequently held that the failure to object to an instruction after it has been submitted to counsel for review will preclude raising an objection on appeal." *State v. Pope*, 211 Neb. 425, 433, 318 N.W.2d 883, 887 (1982). See, also, *State v. Buchanan*, 210 Neb. 20, 312 N.W.2d 684 (1981); *State v. Duis*, 207 Neb. 851, 301 N.W.2d 587 (1981).

Copple also contends that the court erred in giving instruction No. 11:

A director of a corporation shall perform his or her duties as a director in good faith, in a manner he or she reasonably believes to be in the best interest of the corporation and with such care as an ordinary and prudent person in a like position would use under the same or similar circumstances.

A director or other corporate officer has a fiduciary duty not to acquire an interest adverse to that of the corporation while acting for the corporation or when dealing individually with third persons.

Copple argues that instruction No. 11 provides a civil standard for determination of negligence, which is inapplicable in a criminal case.. However, as a proper instruction in a criminal case, this court has upheld use of a jury instruction based on the civil law pertaining to a fiduciary's duty. In *State v. Siers*, 197 Neb. 51, 248 N.W.2d 1 (1976), the defendant was charged with embezzling funds of investors in a limited

partnership in which the defendant was a partner. In *Siers* this court reasoned that, since the defense was predicated on an absence of intent to embezzle, the instruction on fiduciary duties, otherwise applicable in a civil case, was proper to guide the jury's determination regarding the presence or absence of criminal intent. Copple has raised a similar defense in this case: absence of criminal intent in his receipt of funds from Commonwealth. Consequently, we find that instruction No. 11 was proper under the circumstances of this case.

Copple raises several other questions concerning the adequacy of various definitions contained in instruction No. 10. The gist of Copple's complaint is that instruction No. 10 does not contain adequate definitions.

> Prejudicial error regarding jury instructions may not be predicated solely upon a particular sentence or phrase in an isolated instruction, but must appear from consideration of the entire instruction of which the questioned sentence or phrase is a part, as well as consideration of other relevant instructions given to the jury. . . . " ' "All the instructions must be read together and if the instructions taken as a whole correctly state the law, are not misleading, and adequately cover the issues, there is no prejudicial error." ' "

(Citations omitted.) *State v. Dondlinger*, 222 Neb. 741, 749, 386 N.W.2d 866, 871-72 (1986). See, also, *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433 (1984). We find that Copple's contentions are without merit and that the instructions taken as a whole correctly state the law, are not misleading, and adequately cover the issues. We find that the jury was properly instructed.

## MISCONDUCT BY PROSECUTOR

In view of his numerous and repeated objections, Copple contends that a prejudicial impression was created regarding the jury, thereby denying him a fair trial. As this court reasoned in *State v. Ross*, 220 Neb. 843, 845-46, 374 N.W.2d 228, 230 (1985):

> While the granting of a mistrial is within the discretion of the trial court, "Before it is necessary to grant a mistrial

due to prosecutorial misconduct, the defendant must show that a 'substantial miscarriage of justice has actually occurred.' " . . . Furthermore, Neb. Rev. Stat. § 29-2308 (Cum. Supp. 1984) provides that "[n]o judgment shall be set aside, or new trial granted . . . for error as to any matter of pleading or procedure, if the Supreme Court, after an examination of the entire cause, shall consider that no substantial miscarriage of justice has actually occurred."

The defendant has failed to show a substantial miscarriage of justice. As this court has stated previously, "Although the prosecutor was less than artful at times, it does not appear that his conduct was meant to, or did, inflame the prejudices or excite the passions of the jury against the defendant." *State v. Tiff*, 199 Neb. 519, 529, 260 N.W.2d 296, 302 (1977).

We find that the reasoning of *State v. Ross, supra*, disposes of Copple's complaint about the prosecutor's conduct in relation to the matter of objections, inasmuch as Copple has failed to show that the frequency of his objections resulted in substantial prejudice or a miscarriage of justice. See Neb. Rev. Stat. § 29-2308 (Reissue 1985). Copple suggests another aspect of misconduct by the prosecutor—a member of the county attorney's office testified at a committee hearing of the Nebraska Legislature regarding possible amendment of § 28-511(1). How that fact caused unfair prejudice to Copple in his trial is problematic to the point of frivolousness and deserves no further comment. There was no prosecutory misconduct.

## DENIAL OF MISTRIAL

Copple's final assignment of error relates to the district court's refusal to grant a mistrial. Although such refusal by the district court is assigned as error, in his brief Copple does not give a reason or explanation that any one or all of his 20 motions for mistrial were incorrectly refused by the district court. As stated in *Bohaty v. Briard*, 219 Neb. 42, 46, 361 N.W.2d 502, 505 (1985):

Because the assignments of error are not supported by accompanying argument in the briefs, but are mere

statements of general dissatisfaction with conclusions reached by the trial court, we will not speculate about the reasoning behind dissatisfaction of the parties. Without argument and authority in support of an advocated position, speculation is unavoidable.

AFFIRMED.